STATE v. GILLIES et al.

No. 2304.   Decided April 9, 1912 (123 Pac. 93).

1. CRIMINAL LAW—EVIDENCE—STATEMENT OF COCONSPIRATOR.   The rule that statements made by one conspirator are admissible against a coconspirator, when made in furtherance of the unlawful act before consummation, did not authorize the admission of statements of one of two parties jointly charged with the larceny of a cow, which they loaded for shipment, where the statements were made in the absence of the other defendant after the theft had been discovered, the cow unloaded, and the complaint filed.   (Page 545.)

2. CRIMINAL LAW—CODEFENDANTS—ADMISSIBILITY OF EVIDENCE.   On the trial of two coconspirators for the larceny of a cow, evidence admissible as to one could not be excluded, though inadmissible as to the other.   (Page 545.)

3. CRIMINAL LAW—OBJECTION TO EVIDENCE—INSTRUCTION.   Where evidence received in the trial of two codefendants was admissible against one, but not against the other, the defendant against whom it was inadmissible should not only have specifically objected to its admission against him, but should also have requested the court to direct that it be not considered against him.   (Page 545.)

4. CRIMINAL LAW—HARMLESS ERROR.   The admission in evidence of a statement of fact, which is admitted by the accused in his testimony, is harmless.   (Page 546.)

5. CRIMINAL LAW—EVIDENCE OF OTHER ACTS.   The general rule that evidence of an independent offense is inadmissible did not apply in the trial of parties for the larceny of a cow, so as to exclude evidence of the number of cattle loaded on cars by the defendants, their different marks and brands, the owners of the brands, and the number of head belonging to parties other than the defendants or those whom they represented, where the acts of taking, loading, and driving the cow and the other cattle were indivisible.   (Page 546.)

6. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY.   Where the parties on trial for the larceny of a cow, claimed that it was taken by them by mistake and without their knowledge, evidence that twenty-eight head of other cattle were taken at the same time, and under the same circumstances, was admissible to show guilty knowledge and the improbability of the defendants' claim.   (Page 547.)

7. CRIMINAL LAW—INTRUCTIONS—REQUESTS. A requested instruction that, before the jury could consider possession as evidence of guilt, they must be satisfied, beyond a reasonable doubt, that the property had been stolen, and that if they had a reasonable doubt as to whether defendants took the cow intentionally or by mistake, and without knowledge that they had it, the verdict should be for the defendants, was sufficiently covered by a charge correctly stating the presumption of innocence, defining larceny and reasonable doubt, and stating that the state must prove, beyond a reasonable doubt, that the defendants willfully, unlawfully, and feloniously stole, took, and drove away the cow in question, and that, unless they believed from the evidence, beyond a reasonable doubt, that defendants were guilty of stealing the identical animal, it was their duty to acquit. (Page 547.)

8. CRIMINAL LAW—INSTRUCTION. In the trial of two codefendants for larceny of a cow, an instruction that, in determining the intent of the defendants, or either of them, the jury should consider the acts and conversations of the defendants, or either of them, as testified to in the trial, was not objectionable as giving the jury license to convict either or both upon the intent of either, and to consider the separate act or conversation of one in determining the intent of the other, although it did not limit the acts and conversations to those had and done by either in pursuance of the larceny, and before its consummation. (Page 548.)

APPEAL from District Court, Fifth District; *Hon. Johsua Greenwood,* Judge.

Dudley Gillies and Stanley Puffer were jointly convicted of the larceny of a cow. Both appeal.

AFFIRMED.

*J. W. N. Whitecotton* for appellants.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins* and *George C. Buckle,* Assistant Attorneys-General, for the State.

STRAUP, J.

The defendants were jointly informed against and jointly tried for the larceny of a cow, the property of one Murdock. Both were convicted, and both appeal. The questions for re-

view relate to the admission of evidence and to the charge.

Both defendants resided in Beaver County, where the alleged crime was committed. For some time prior to the alleged offense, Gillies was engaged in buying and shipping cattle from Milford and the ranges nearby. He also had a few head of cattle of his own on the range, fifteen or twenty. At the time of the alleged offense, Puffer was, and for about six months prior thereto had been, employed by Gillies to assist in gathering and caring for cattle, and to some extent in buying cattle. Gillies claimed that he had purchased, or had the right to purchase and take, cattle on the range belonging to his father and to a cattle company in which his father was interested. On the 21st of February, Gillies arranged for and ordered two cars for the shipment of cattle from Milford to Kansas City, Mo. On the 22d, he and Puffer went on the range nine or ten miles from Milford and gathered about seventy head of stock cattle, two carloads, having about a half dozen different brands, and belonging to that many different owners. None of the cattle belonged to Gillies or Puffer. About forty head belonged to Gillies' father and the cattle company, and about twenty-nine head belonged to others, and bore their brands. The cattle were driven part of the way from the range to Milford by both defendants. When within four or five miles of Milford, Gillies rode ahead to procure feed. Puffer followed with the cattle, arriving at the stockyards at Milford after dark. He was unable to put them in the cattle yard or pen, and so drove and placed them in the sheep yard. The next day the cattle were placed in the cattle yard. There they were kept until the night of the 24th, when they were loaded on cars and billed to Kansas City. Puffer intended to accompany the shipment as caretaker, and Gillies to go on a passenger train. The cars were not picked up that night, and were still at Milford the next morning, the 25th. That morning, at about 7:30 o'clock Murdock, the complaining witness, inspected the cattle on the cars, and there found a cow belonging to him, the subject of the larceny, and three or four head of cattle belonging to his son. Shortly thereafter, he met Gillies at the station, and

had a conversation with him in Puffer's absence, and while the cattle were yet on the cars. Murdock, over Puffer's special objection, on the ground of hearsay and no showing that Gillies was authorized to make any binding statement or admission as against Puffer, was permitted to testify as to that conversation. The conversation was as follows: Gillies said to Murdock: "I understand you claim some of the cattle on the cars. Murdock: Yes, sir, Gillies: What are you going to do about it? Murdock: I am going to have them cut out. Gillies: Aren't you mistaken about having cattle there? Murdock: No, sir; I am not mistaken. I know my cattle when I see them. Gillies: Well, I haven't been with the cattle. Stanley (Puffer) drove the cattle over. I have not been with them. I have not seen them. If you have any cattle, I will have them unloaded, and we will cut them out. Murdock: That is what I want. Gillies: There may be a few in there. . . . I believe there is eleven head in there that don't belong to me."

Several hours thereafter, and after Murdock had filed a complaint in the justice court at Milford, charging both Gillies and Puffer with the larceny of the cow, and after the cattle had been unloaded and placed in the cattle yard, Murdock had another conversation with Gillies in Puffer's absence. The testimony of this conversation was also received over the special objection of Puffer. This conversation, as testified to by Murdock, was as follows:

"Gillies came to me in front of the Atkins' Hotel (at Milford), and wanted to know if there could be something done. He said that he was willing to take the cattle and put them back on the range, or do anything to make things right; and I told him: 'Dudley' (Gillies), I says, 'this thing is in the hands of the law now, and I don't want to do anything but the right thing.' I says: 'I cannot consent to your taking the cattle back, or doing anything else.' 'Well,' he says, 'if that is the case, it will have to go at that.'"

Testimony of other conversations had with Gillies in Puffer's absence, and after the complaint had been filed and the cattle had been unloaded, was also received over Puffer's

objection; but nothing was said in them implicating or derogatory to his conduct.

The cattle, after they had been unloaded and placed in the yard, were separated. Different owners then were present and identified cattle, about twenty-nine head, taken by the defendants from the range which did not belong to Gillies or his father or the cattle company.

The defendants claimed that Murdock's cow got with the herd by mistake and without their knowledge in gathering or driving the cattle from the range, or that she was in or about the corral when the cattle were driven in the yard, and was, without their knowledge and by mistake, loaded on the cars.

It is contended that the court erred in receiving the testimony of the conversations had in Puffer's absence. The objection in the court below was separate, and was made on behalf of Puffer alone. The state seeks to defend the ruling, and contends that the evidence was admissible as against both defendants, on the theory of a conspiracy or combination between the defendants to commit larceny, and that the statements made by Gillies in the conversations were made in furtherance or in pursuance of such unlawful act or acts, and before the consummation by them. That may be true as to the first conversation; but it cannot be true as to the subsequent conversations and those had after the cattle had been unloaded and the complaint filed. It may be 1, 2, 3 said that the first was *res gestae* of the main transaction; but not so of those had after the complaint was filed. But there are other good reasons why Puffer is not in a position to complain. All the conversations were admissible against Gillies. That is conceded. Let it be assumed that the conversations were inadmissible as against Puffer. The defendants were tried jointly. They were coparties. Evidence which is admissible as against one or more coparties and inadmissible as to other coparties cannot be excluded. It is the duty of the court to receive it. The party or parties against whom it is inadmissible should not only specifically object to its admission as against them, but should also re-

40 Utah—35

quest the court to admonish or direct the consideration and effect of it to those only against whom it is competent and admissible. No such request was asked. In such case, error cannot be imputed to the court in receiving the evidence, but in failing or refusing to limit the consideration and effect of it. No such complaint is made. The only complaint made is that the court erred in receiving the evidence.

Furthermore, the statements made by Gillies did not harm Puffer. The only statement tending to do so in the first conversation is that "Stanley drove the cattle over" from the range to Milford. It, however, was testified to by both Gillies and Puffer that both gathered the cattle on the range, and that both drove them part of the way and within a few miles of Milford. There is no conflict in the evidence as to that. So the statement of Gillies to Murdock that Puffer "drove the cattle over" did not harm him. In the subsequent conversations, no statement or remark was made which implicated or involved Puffer, or which was prejudicial to him.

The defendants were informed against for the larceny of but one cow, the property of Murdock. The state, over the objection of defendants, was permitted to show the number of cattle loaded by them on the cars at Milford, the different brands and marks upon them, the owners of the brands, and that there were twenty-nine head having brands belonging to persons other than Gillies or the cattle company. It is urged that such proof tended to show larcenies other than that declared on, and was therefore inadmissible. The evidence was properly received. On the theory of the state, supported by evidence, the cow, the subject of the larceny, was gathered on the range with the other cattle testified to by the witnesses, and was driven with them to Milford, where they were all loaded at the same time. The taking, the driving, and the loading of the cow and the other cattle were all one act, one transaction. The acts of taking, driving, and loading the cow and the other cattle were indivisible. A complete account of the transaction of the one could not be given without also showing the other; and the

two were so inseparably connected that the proof of one necessarily involved proving the other. The general rule that, on a prosecution for a particular crime, evidence which tends to show that the accused committed another crime, independent of that for which he is on trial, even though it be a crime of the same sort, is irrelevant and inadmissible is not here applicable.

Moreover, the evidence was relevant and admissible as bearing on the claim of the defendants that the cow was taken by them by mistake, and without their knowledge. The fact that twenty-eight head of other cattle of a herd of seventy were taken at the same time that the cow was taken, and under the same conditions and circumstances, and in the same transaction, rendered the defendants' claim less probable, and tended to show guilty knowledge.

The defendants requested the court to charge that, before the jury could consider the possession of property as evidence of guilt, they must first be satisfied, beyond a reasonable doubt, that the property had been stolen, and that if they had a reasonable doubt as to whether the defendants took the cow intentionally and willfully, or by mistake and without knowledge that they had the cow, their verdict should be for the defendants. The court did not charge the jury in this language. It gave the usual charge as to the presumption of innocence, defined larceny and reasonable doubt, instructed the jury that the burden was upon the state to prove, beyond a reasonable doubt, that the defendants willfully, unlawfully, and feloniously stole, took, and drove away the cow in question, and that the cow was the personal property of Murdock, and specifically charged the jury that "the defendants are only on trial for the crime charged in the information; and, unless you believe from the evidence, beyond a reasonable doubt, that they are guilty of stealing the identical animal set forth in the information, it is your duty to acquit them." These charges necessarily included the elements in the refused request, that if the jury had a reasonable doubt as to whether the defend-

ants took the cow intentionally and willfully, or by mistake and without knowledge that they had the cow, their verdict should be for the defendants. For, under the charge, the jury, before they were authorized to convict the defendants, were required to find, beyond a reasonable doubt, that the defendants willfully, unlawfully, and feloniously stole, took, and drove away the identical cow in question; and when they so found they necessarily found, beyond a reasonable doubt, that the defendants did not take the cow by mistake, or without knowledge that they had the cow.

The court also charged the jury:.

"I instruct you that if you find, beyond a reasonable doubt, that the defendants, or either of them, had the animal described in the information in their possession, and that such possession was without the consent or permission of the owner thereof, then you may consider and conclude whether or not the defendants, or either of them, intended, against the will of the owner, to permanently deprive him of the same; and in determining the intent of the defendants, or either of them, you may take into consideration the acts and conversations of the defendants, or either of them, as testified to in the trial of this case."

Complaint is made of this. It is urged that this language gave the jury the license to convict either or both of the defendants upon the intent of either, and that the separate act or conversation of one could be considered in determining the intent of the other. The state seeks to defend the instruction on the ground that the defendants had conspired and combined to commit larceny; and therefore conversations and acts had and done by either in pursuance of such unlawful act, and before it was consummated, could properly be considered by the jury against the other. But the charge does not so limit or restrict the acts or conversations. The charge is broad enough to cover and include, not only conversations and acts had and done in pursuance of the unlawful act, and before the consummation of it, but also acts and conversations not in pursuance or in furtherance of such, or any unlawful or wrongful, act, and

after the consummation of it.. The language of the charge is somewhat involved, and is not happily put. However, we do not think it fairly open to the defendants' contention. In the first place, the court did not direct a conviction upon the stated hypothesis. The court merely told the jury that, in determining the intent of the defendants as to permanently depriving the owner of the property without his permission or consent, the acts and conversations of the defendants could be taken into consideration. And, in the next place, the charge is not fairly open to the construction that, in determining the intent of one, the act or conversation only of the other could be considered. Such a construction gives an abstruse, rather than a readily and ordinarily perceived, sense to the language; and we do not think the jury gave it the meaning which counsel for the defendants attribute to it.

We think the judgment of the court below should be affirmed. Such is the order.

FRICK, C. J., and McCARTY, J., concur.