[Civ. No. 7304.   Second Appellate District, Division Two.—February 24, 1933.]

J. B. McGALLIARD, Respondent, v. J. D. HALSTEAD LUMBER COMPANY (a Corporation), Appellant.

COKER & TAYLOR, INC. (a Corporation), Respondent, v. J. D. HALSTEAD LUMBER COMPANY (a Corporation), Appellant.

Culver & Nourse and Fred J. Furman for Appellant.

James F. McBryde, G. C. DeGarmo and W. M. Crane for Respondents.

ARCHBALD, J., *pro tem.*—In the spring of 1927 J. R. Luttrell and wife purchased a lot in Los Angeles for the purpose of improving same with an apartment house. Respondents herein were subcontractors, McGalliard having the contract for brick work and Coker & Taylor, Inc., the contract for the plumbing. Before the work on such contracts was started orders were issued to appellant lumber company by Luttrell and wife in favor of said contractors for the contract price, payable in four installments. On such orders, as stated in appellant's brief, C. C. Overpeck, "who was employed to handle sales promotion, especially in connection with construction and financing in conformity with the program of the Security Housing Corporation", imprinted a purported acceptance, using a rubber stamp bearing the name of appellant corporation and signed, "By C. C. Overpeck". Suit was brought for the unpaid balance due each respondent, and from judgments in their favor these appeals were taken.

The sole question raised is the authority of Overpeck to bind appellant by such acceptances. Appellant is an Arizona corporation, with three directors, J. G. Halstead, the president, and two sons, one of whom, A. E. Halstead, is secretary-treasurer. No express authority was given to make such acceptances, and unless the evidence shows that appellant either intentionally or by want of ordinary care caused an implied authority to be conferred upon Overpeck there would be no support for the findings that appellant accepted and agreed to pay the orders above mentioned.

The first loan of $50,000 was agreed to be advanced by the Security Housing Corporation. The owner, Luttrell, testified that he was given a list of lumber dealers by said housing corporation, "because the first loan was not sufficient and

the lumber dealers would take care of the second trust deed''. The name of Overpeck ''was on the list that the Security Housing Corporation supplied'', testified Luttrell, and ''I saw Overpeck and talked with him about the deal. . . . A clerk said that he was credit manager and sent me to see Overpeck. . . . I took up the matter of the loan with Overpeck of the Halstead Lumber Company''. Apparently thereafter and on the sixth day of July, 1927, two trust deeds for $50,000 and $25,000 respectively were made. Appellant was the beneficiary under the first of these two. The application for the $25,000 loan is on a blank of the J. D. Halstead Lumber Company and is apparently made to it. In the commitment of the housing corporation to make the loan that company purchased the note secured by the first trust deed for the agreed sum of $50,000, to be paid as follows: $12\frac{1}{2}$ per cent when foundation was in, etc., $12\frac{1}{2}$ per cent when building was completely framed and roofed, 25 per cent when interior was plastered, etc., and 25 per cent when building was substantially ready for occupancy, the balance to be paid ''after notice of completion has been filed and the improvements have been finally approved by the Corporation''. By acceptance of the commitment the lumber company guaranteed the payment of any liens prior to such deed of trust. The commitment was accepted by appellant July 11, 1927. The two trust deeds and accompanying notes were escrowed with the Metropolitan Trust Company under instructions signed by the Luttrells and appellant. With regard to the ''papers'' and the escrow, Mr. Luttrell testified that when the instruments were made out he took them to his wife, ''and then I went over to the J. D. Halstead Lumber Company and signed the papers. . . . I had no agreement except through Overpeck. Overpeck handled the escrow instructions. I had no other dealings with anybody in the Halstead Lumber Company. All of my dealings were with Overpeck. I did not come in contact with either of the Halsteads until the building was almost completed. I explained to Green, a salesman for Coker & Taylor, that the money would not be paid out except on orders at the time he gave me the bid. The work started approximately when the orders were issued''. With regard to the orders made out to respondents and other subcontractors, Luttrell said: ''He [Overpeck] requested me to

make the orders out to the Halstead Lumber Company for the subcontractors. The money was to be paid on orders given by me to the Halstead Lumber Company and was pursuant to my conversations with Overpeck.''

C. C. Overpeck testified: ''I handled the deals during the first six months but the Halsteads actually signed the mortgages, trust deeds, escrow instructions and things that required the corporate seal.'' With regard to the Luttrell deal he said that he talked with a Mr. Allen of the Security Housing Corporation about it and that about a week later Luttrell came to see him; that he took the matter under advisement and discussed it with the Halsteads. ''I handled [several] similar projects while I was with the Halstead Lumber Company . . . in the same manner and I had complete charge of the transactions.'' He further testified that at the time he was employed nothing was said about his official capacity; that later it was discussed; that he had then financed several contracts and was told to take over the credit department in addition. He said that Luttrell or one Armstrong presented several different setups of the job above referred to, and that he conferred with them and afterwards took up the project with the Halsteads, who ''left everything to me''. A change in the cost setup was made to cover an increase in the cost of construction, and apparently this was arranged by Overpeck, who wrote a letter for the Halstead company to the Security Housing Corporation confirming a telephone conversation with their Mr. Tracy regarding the change in payments, using the same stamp with which the acceptances were signed. Incidentally, this stamp was furnished Overpeck by the Halsteads, the former testifying that he had used it ''in other similar transactions with other people before this one, and handled in the same manner'', and that the Halsteads knew of this fact. As the job progressed, according to Overpeck, he would request an inspection so that checks to make progress payments could be obtained, and when calls came in with reference to the projects the telephone girl referred them to him. With regard to the orders, the witness said that he told Mr. Luttrell how he would ''have to draw these orders on this loan. It was discussed a number of times with the Halstead Lumber Company. . . . I think in all instances I had written my acceptances on behalf of the Halstead Lumber Company for

the orders held by the subcontractors." Again, he said: "Except in case of the lot pay-off I did not submit any orders written by Luttrell . . . either to A. E. Halstead or J. D. Halstead, without putting my name on them or using the rubber stamp." Overpeck did not know if he submitted the Coker & Taylor orders to either of the Halsteads, but said he did not submit any of the McGalliard orders to them.

We have quoted enough of the testimony, we think, to show that outside of the actual signing of escrow instructions and commitments the deals were all handled by Overpeck. This seems to be well corroborated by A. E. Halstead, the secretary-treasurer of the company, who testified that prior to Overpeck's coming the company did business with the housing corporation "in a similar manner". "I looked after the business before Overpeck came." It was very natural, then, that Luttrell should direct the subcontractors to take their orders to Overpeck, and the trial court might well have found that that was the usual method of handling the business. William F. Creighton, an estimater for respondent Coker & Taylor, testified that he had a conversation with Overpeck a few days before the orders in question were signed, "because I wanted assurance about the payments on the contracts"; that when he got the orders covering their contract from Luttrell he was told to see Overpeck; that Overpeck looked the orders over and signed them; that the latter said the "first payments would be rather small", and that they were fixed in the sum of $500 each; that Overpeck told him that by so doing "when it came to making the last payment there would be enough to take care of it". The two orders of $500 each were paid, and Creighton went to collect the last order, which was for $6,061.00. According to his testimony Overpeck told him that the money was not available and to come back later; that in the meanwhile he would talk it over with Mr. Halstead and see if it could be paid. Creighton came back and, as he testified, had considerable trouble and was delayed in seeing Mr. Halstead himself. After waiting some time, however, on the second or third day of his attempts, he asked the telephone operator if he could see Mr. Halstead, and was once more told that he could not. "So I went right into Mr. Halstead's office and laid the order down on his desk and asked him what he was going to do about it."

Halstead asked him if he "would accept a lesser amount than what was due on the last order and later he would take care of the balance", but the witness replied that he wanted it all, and later was given a check for $3,983.75. "He [Halstead] did not say they were not executed by the company or anything to that effect. I delivered the orders to him. He did not deny the orders."

Respondent McGalliard received his order from Luttrell and was told to see Overpeck, who accepted it. The payments on such order were $900, three of $700 each and the balance of $4,600 when the building was completed. He testified that he talked with Overpeck about the financial arrangement. His attorney, in getting information about how the job would be handled, called the Halstead Lumber Company on the telephone and asked for the person who had the Luttrell job. The caller was told it was Overpeck, and the call was transferred to the latter and the information obtained. Similar orders of other subcontractors on this same job, also accepted by Overpeck, were introduced in evidence. Apparently the account of the Halstead Lumber Company for material furnished on the Luttrell job was kept paid out of the progress payments, and about $3,000 out of the proceeds of the loan was used to pay for furniture for the apartment house, and the balance of the purchase price of the lot was also paid therefrom. Mr. Coker, of respondent firm, testified that he had a conversation with A. E. Halstead about "getting the balance of our payment on those orders", and that the latter said nothing about their not being authorized. C. C. Overpeck, speaking of A. E. Halstead, testified: "He just began to repudiate the orders at that time. It was after he knew the job would not be paid off in full."

There is ample evidence from which the trial court could conclude that respondents believed, and were justified in believing, that appellant had clothed Overpeck with authority to handle the details of such jobs after the original commitment and escrow papers were signed, notwithstanding the fact that he apparently had no authority to sign checks. The detail of satisfying subcontractors that their money would be paid on the orders submitted was a very necessary one. Both respondents, and apparently all subcontractors on this and prior jobs handled by Overpeck, wanted and

obtained the same assurance before starting on their contracts, and the court, as well as respondents, might well have concluded that the acceptance of such orders was a part of the method of handling the business of the company, just as it was when carried on by A. E. Halstead prior to Overpeck's employment. Everyone making inquiries at the Halstead company's office as to who was handling the Luttrell job was referred to Overpeck, and the court was justified in concluding that the officers must have intended that Overpeck was to take care of the matter of satisfying successful bidders on subcontracts, and must have known that such individuals could not very well be satisfied without some satisfactory writing from the company that they would be paid out of the funds to be placed in its control. The company's officers must have known that they were not executing any such assurances, and the trial court could conclude from the evidence that they either knew of the manner in which Overpeck was meeting the situation or should have known, and that he had actual authority to do as he did. (Civ. Code, sec. 2319.) Under the circumstances shown it is obvious that they permitted Overpeck to believe that he possessed such authority. (Sec. 2316, Civ. Code.) "It is not the law that the authority of an agent to act for a corporation can only be proven by the minutes of its board of directors or by a contract in writing. It may be shown by evidence that the person does business for the corporation and on its behalf, as agent, with the knowledge and acquiescence of its directors or general manager, or by their direction. The company, in such a case, is bound by his acts and declarations within the scope of the business intrusted to him." (*Venice* v. *Short Line Beach Land Co.*, 180 Cal. 447, 453 [181 Pac. 658, 661].) ▮▮ Where the fact of agency rests in parol it may be established on the trial by the testimony of the agent himself. "His testimony is admissible and competent to prove the agency and the nature and scope of his authority to bind his principal thereby." (*Kast* v. *Miller & Lux*, 159 Cal. 723, 727 [115 Pac. 932, 933].) Where there is no express authority "it is proper to describe the work performed by the agent in the course of his employment, bringing it home to the knowledge and implied acquiescence of the principal". (10 Cal. Jur. 987.) We are forced to conclude that there

was evidence in the instant case from which the trial court might well have determined that such knowledge was brought home to appellant, notwithstanding conflicting evidence from which a contrary conclusion might have been drawn. And on the other hand we cannot conclude, as a matter of law and under the evidence favorable to respondents, that the latter were "without want of ordinary care" (sec. 2334, Civ. Code) in acting as they did.

Judgments appealed from are affirmed.

Works, P. J., and Craig, J., concurred.