## STATE v. ERWIN et al.

No. 6200. Decided December 11, 1941. (120 P. 2d 285.)

Rehearing Denied March 24, 1942.

374

See 11 Am. Jur., 571; 15 C. J. S. Conspiracy, sec. 88.

*Ball & Musser, H. L. Mulliner,* and *Edward F. Richards,* all of Salt Lake City, for appellants.

*Joseph Chez,* Atty. Gen., *Grover A. Giles,* Asst. Atty. Gen., and *Calvin W. Rawlings,* Dist. Atty., and *Brigham E. Roberts,* Asst. Dist. Atty., both of Salt Lake City, for respondent.

WADE, District Judge.

In this case the State of Utah prosecutes the defendants, E. B. Erwin, Harry L. Finch, R. O. Pearce, Frank A. Thacker and Ben Harmon, for a conspiracy to allow the

violation of the anti-vice laws, on an indictment returned by the grand jury.

The defendant Ben Harmon died before the trial, and Frank A. Thacker was acquitted by the jury. The other defendants were convicted and bring this appeal.

The allegations of the indictment material to this appeal are as follows:

"That the said E. B. Erwin, Harry L. Finch * * * (and) R. O. Pearce * * * the said E. R. Erwin at all times herein mentioned being the duly elected, qualified and acting Mayor and Commissioner of Public Safety of Salt Lake City, * * * and the said Harry L. Finch, * * * being the Chief of Police of Salt Lake City, * * * on the 6th day of January, 1936, and on divers other days and times between that day and the 1st day of January, 1938, at the County of Salt Lake, State of Utah, did wilfully and unlawfully agree, combine, conspire, confederate and engage to, with and among themselves * * * and to and with divers other persons to the grand jury unknown, to commit acts injurious to public morals and for the perversion and obstruction of justice and the due administration of the laws of the State of Utah. To wit:

"That the said E. B. Erwin, Harry L. Finch * * * (and) R. O. Pearce * * * did wilfully and unlawfully agree, combine, conspire, confederate and engage, to, with and among themselves * * * and to and with divers other persons to this grand jury unknown, wilfully and corruptly to permit, allow, assist and enable houses of ill fame, resorted to for the purpose of prostitution and lewdness, and lotteries, dice games, slot machines, book-making and other gambling devices and games of chance to be kept, maintained and operated at various places in Salt Lake City, Salt Lake County, Utah, the said defendants then and there well knowing that said houses of ill fame, lotteries, dice games, slot machines, book-making and other gambling devices, and games of chance, were being kept, maintained and operated in Salt Lake City in violation of the statutes of Utah and the ordinances of Salt Lake City, and in furtherance of said conspiracy did commit the following overt acts:

"1. That during all the period of time between March 15, 1936, and January 1, 1938, the said defendants permitted, allowed, assisted and enabled houses of ill fame, resorted to for the purpose of prostitution and lewdness, to be kept, maintained and operated at various places in Salt Lake City * * *.

"2. That during all the period of time between March 15, 1936, and January 1, 1938, the said defendants permitted, allowed, assisted,

and enabled lotteries, dice games, slot machines, book-making, and other games of chance and gambling devices to be kept, maintained and operated at various places in Salt Lake City * * *.

"3. That on or about the first day of each and every month, between the months of June, 1937, and January, 1938, both months inclusive, the defendants collected and caused to be collected money from the operators of various houses of ill fame, in various places in Salt Lake City * * *.

"4. That at various times between April 1, 1936, and January 1, 1938, the defendants collected and caused to be collected money from the operators of various lotteries, dice games, slot machines, book-making, and other games of chance and gambling devices at various places in Salt Lake City. * * *"

In due course the defendants demanded and the court required the State to furnish a bill of particulars, and the State furnished to the defendants detailed information of what the State intended to prove.

Counsel for the defendants urge that the indictment was obviously insufficient and inadequate. That under Section 12, Article I, of Utah Constitution, and under Section 105-1-8, Paragraph (2), of Revised Statutes of Utah for 1933, the accused is guaranteed the right to demand the nature and cause of the accusation against him and to have a copy thereof. And that this court and many other courts have repeatedly held that it is not sufficient to use generic terms, but the indictment must state the particulars so distinctly that the accused will be advised of the charge he is to meet and to be given a fair opportunity to prepare his defense, always assuming that he is innocent and knows nothing of the facts charged, and so that he can avail himself of the disposition of this charge in defense of another prosecution for the same offense. See *United States* v. *Cruikshank,* 92 U. S. 542, 23 L. Ed. 588; *United States* v. *Hess,* 124 U. S. 483, 8 S. Ct. 571; 31 L. Ed. 516; *State* v. *Topham,* 41 Utah 39, 123 P. 888; *State* v. *Lund,* 75 Utah 559, 286 P. 960. All of the cases which counsel cited, including the above, hold that the indictment passed on failed to state in sufficient detail the offense charged, and pointed out the details which

were lacking; but counsel has not pointed out the details which he claims are lacking in this indictment.

By inference, counsel argue that the indictment uses terms which might have many different meanings and therefore is not sufficiently specific in alleging that the defendants conspired to "permit, allow, assist and enable houses of ill fame" and gambling games and devices to operate; but even in this counsel fails to point out more than one possible thing that the defendants, some of whom were city officials, could possibly do under that allegation. By the very nature of the thing about all they could do, or conspire to do, would be to do nothing,—to take no action to prevent the operation of such places; to fail to make arrests, or to fail in any manner to enforce the law. That description of what they conspired to do can have but one meaning. In the case of *People* v. *Tenerowicz,* 1934, 266 Mich. 276, 253 N. W. 296, 298, the indictment was almost in the exact words of the indictment in this case. In that case it was alleged that the defedants conspired to "permit and allow" houses of ill fame to operate. The court held that these words should be construed as meaning and charging that the defendants conspired to "assist and enable" the other parties to operate and maintain houses of ill fame. The indictment in the present case uses all four of these terms. In the Tenerowicz case the court held the indictment sufficient, and also that the court did not err in failing to require the State to furnish a bill of particulars on the demand of the defendants, and held that the indictment stated the offense in sufficient detail, —that where a conspiracy to commit an offense is charged the conspiracy is the gist of the crime and the offense which is the object of the conspiracy need not be alleged in the same detail as where the defendant is charged with the commission of that offense. Citing *People* v. *Di Laura,* 259 Mich. 260, 243 N. W. 49; *People* v. *Clark,* 10 Mich. 310; *People* v. *Petheram,* 64 Mich. 252, 31 N. W. 188; *Williamson* v. *United States,* 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed.

278; *Wong Tai* v. *United States*, 273 U. S. 77, 47 S. Ct. 300, 71 L. Ed. 545. This indictment is clearly stated in sufficient detail to inform the defendants of the nature and cause of the accusation against them and to satisfy the requirements of the Constitution and statute. The main argument of the defendants against the indictment is, that if the indictment is insufficient in detail it cannot be made sufficient by the bill of particulars. It is not necessary for us to determine this question because this indictment is sufficient without the bill of particulars.

Counsel further urge that the indictment is insufficient because under Sec. 103-11-3 it is provided,

"No agreement * * * amounts to a conspiracy, unless some act, besides such agreement, is done to effect the object thereof by one or more of the parties to such agreement."

And that the "overt acts" set out in the indictment are not "overt acts" at all. That the first and second "overt acts" charged, to the effect that the defendants permitted houses of vice to operate, are a part of the agreement and need some other acts besides the agreement to effect its object. They attempt to prove this by placing on opposite sides of a page a statement of what the agreement is and what the defendants did, and seem to conclude that since the information alleges that defendants agreed *to permit* houses of vice to operate, and, as an overt act, that defendants permitted houses of vice to operate, that the act of permitting houses of vice to operate is a part of the agreement, and not an act besides such agreement, to effect the object thereof. In this argument, counsel loses sight of the fact that to agree, conspire, and plan consists of meeting of the minds on a plan of action or course to be followed in the future But when you start to do or perform the acts planned or agreed upon, then you are doing overt acts, or doing acts to effect the object of the agreement. The doing of the acts agreed upon and the agreeing upon the acts to be done in the fu-

ture are separate and distinct acts. The most immediate object of any agreement to do some future act is to get the acts agreed upon done; that is, the very act which they agreed to do. There may be, and probably is, in all agreements to do acts in the future, more remote objects of the agreement. Each party to the agreement may have a different object in entering into the agreement. For instance, in most acts which we do or agree to do we expect to receive remuneration for such services. In this case, by the allegations of the indictment, they first agreed to permit houses of vice to operate. As long as they confined their activities to planning, talking about, and agreeing what they would do in the future, in this kind of a case, there would be no criminal offense committed, and in order to make a criminal offense the defendants must do some act besides merely planning, talking about, or agreeing to do something in the future; they must do some act to effect the object of the agreement. The statute does not say that no agreement amounts to a conspiracy unless some act *besides the act agreed upon to be done* is done, to effect the object thereof. It merely says that some act besides the *agreement* must be done, to effect the objects thereof, before it will amount to a conspiracy.

The cases cited and quoted from in their brief do not sustain counsel's contention. *People* v. *Hines,* 168 Misc. 453, 6 N. Y. S. 2d 2, 5, 15, quoted by counsel, says: that the defendant Hines "met with others and conferred upon and discussed plans to influence, intimidate and bribe judicial officers." This, the court says, "is really a part of the conspiracy, looking toward action in the future, and is not properly an overt act." In other words, the court says this meeting and discussing plans to influence judicial officers was merely planning and agreeing on what they would do in the future, but was not doing anything to influence the judicial officers, and an overt act did not occur until they approached or attempted to bring pressure to bear upon a judicial officer to influence his decision. In *United States*

v. *Grossman,* D. C., 55 F. 2d 408, 410, the court says the overt act "must not be one of a series of acts constituting agreement," but must be "done to carry into effect the object of the original agreement," clearly making the distinction between agreeing upon a course of action to be followed in the future and the doing of the acts which have been agreed upon. In *Marino* v. *United States,* 9 Cir., 91 F. 2d 691, 695, 113 A. L. R. 975, the court said the overt acts need not be "the very crime that it is the object of the conspiracy," but it must "be done in furtherance of the object of it." This quotation clearly indicates that the overt act might, but need not necessarily be the very crime that is the object of the conspiracy. It is also indicated that the crime agreed upon is the object of the conspiracy. There can be no question but that the permitting of houses of vice and gambling houses to operate was the immediate and main object of the conspiracy charged.

Counsel say that "3" and "4" of the overt acts alleged in the indictment, were not overt acts, because the collection of money from the operators of houses of vice does not enable such houses to operate, because they do operate regardless of what public officials do to enforce the laws. By this argument they unwittingly concede that the object of this alleged conspiracy was to permit houses of vice to operate. And by this argument they overlook the issues in this case. The gist of the criminal conspiracy charged in this indictment is the agreement between these defendants, whose duty it was to enforce the law, to allow and enable houses of vice to operate in violation of the law. This agreement was a violation of the law whether they could effectively enforce it or not. It was their sworn duty to do what they could to enforce it, regardless of how effective their efforts might prove. And if they entered into this agreement then the crime of conspiracy was complete when, in addition thereto, they, or either of them, did any act "to effect the object" of the agreement, even though that act did not itself effect the object of the agreement.

Some courts have said such acts need have no tendency to effect such object. See *People* v. *George,* 74 Cal. App. 440, 241 P. 97; *Hall* v. *United States,* 10 Cir., 109 F. 2d 976. And many cases hold that receiving bribes by officers is a sufficient overt act. *Hall* v. *United States,* supra; *Cook* v. *United States,* 8 Cir., 28 F. 2d 730; *Collier* v. *United States,* 5 Cir., 255 F. 328; *United States* v. *Manton,* 2 Cir., 107 F. 2d 834.

It is also argued that the indictment is insufficient in that it does not charge that there was an agreement between the operators of houses of ill fame and the operators of gambling houses and the city officials and others to permit the illegal operation of these activities, but that in this case the agreement is between the city officials and certain agents of theirs to allow the operators of these illegal activities to operate; that the operators of these illegal businesses are not charged with having been a party to this agreement. It is true that the indictment does not charge that either of the defendants was the operator of any of the illegal activities. Nor does it directly charge that the operators of these illegal businesses are parties to this conspiracy. This case is distinguished from the case of *People* v. *Tenerowicz,* 266 Mich. 276, 253 N. W. 296, and the other cases cited by the state in this regard. But the indictment charges that the defendants agreed "to, with and among themselves * * * and to and with divers other persons" to permit, allow, assist and enable certain illegal activities to operate. It further alleges that, as an overt act, the defendants collected and caused to be collected money from the operators of these illegal places. These allegations by implication do indicate that the agreement was with the operators of the illegal activities. The evidence tends to show that the operators were parties to the conspiracy, and that is the theory of the state during the trial.

Is it necessary, in order to constitute a public offense in a case of this kind, to allege that the agreement complained of was between the city officials and the persons who op-

erated the illegal activities? Would it be any less criminal for the mayor and chief of police to agree between themselves that they would not prosecute the violators of the vice laws than it would be for them to agree among themselves and with certain violators of the law that they would not prosecute them for the violation of the law?

Section 103-11-1 provides that:

"If two or more persons conspire: * * * To commit any act * * * for the perversion or obstruction of justice or the due administration of the laws;—they are punishable * * *."

And, a

"conspiracy with or among public officials not to perform their official duty relative to enforcing criminal laws * * * is an obstruction of justice."

So says the court in *People* v. *Tenerowicz*, supra. Although the facts in that case showed a conspiracy between the public officials and operators of illegal houses, yet in the statement of the law by the court it fails to mention operators as a necessary party to the conspiracy. The statute above referred to is violated when public officials whose duty it is to enforce the law agree among themselves and their agents that they will not enforce it. And it is not necessary that the agreement be to the effect that certain parties to the agreement may violate the law without prosecution. The indictment is therefore sufficient.

The District Attorney, over the objection of the defendants, introduced the evidence to some extent in the chronological order of the happening of the events, rather than first producing his evidence which tended to prove that a conspiracy existed and then producing evidence which tended to connect the individual defendants with the offense. Thus before a prima facie case as to the corpus delicti had been made, evidence was received which did not tend to show the existence of the conspiracy.

On this subject, Wigmore on Evidence, Second Edition, Section 1867, says:

"It is obvious that while a usual order for introducing topics of evidence and witnesses is a desirable thing, a variation from that order, which is often equally desirable, will not necessarily cause direct harm; it can do so only where it tends to confuse the jury, or where it misleads the opponent or finds him unprepared to meet it. Moreover, the necessity for such a variation and the likelihood that it will confuse or mislead must depend almost entirely upon the particular circumstances of each case.

"Accordingly, it is a cardinal doctrine, applicable generally to all of the ensuing rules that they are not invariable, that they are directory rather than mandatory, and that an *alteration of the prescribed customary order* is always allowable in the *discretion of the trial court.*" (Italics added.)

In this same work there is a discussion of this rule as applicable to co-conspirators, at Section 1079, and as applied to the corpus delicti, at Section 2073, each holding that the trial judge may determine the order of this evidence and that the reviewing court will not interfere with its determination unless the defendant has been caused direct harm by the order of receiving the evidence. Here the defendants' counsel earnestly contend that the jury was thereby confused by the reverse order of receiving the evidence; but it does not appear how this confused the jury, and therefore no error was committed.

In this case the substance of the charge in the indictment is that the defendants agreed with and among themselves and others to permit, allow, assist and enable houses of ill fame and gambling games and devices to be maintained and operated in violation of the law, and, as overt acts, that they did allow these places to operate and that the operators paid the defendants therefor. The defendants contend that the evidence, without their admissions, is insufficient to prove the corpus delicti; that there is not sufficient corroboration of the testimony of the accomplices to connect either of the defendants with the crime; and that the evidence is insufficient to convict the defendants at all and should have been taken from the jury.

In order to support a verdict, the State must prove the corpus delicti; that is, that a crime was committed. In this case it must be shown that there was such an agreement as was alleged in the indictment, between some of the defendants, and that one of the overt acts alleged has been committed, and this without the aid of the admissions of the defendants themselves. But it does not mean that such defendant must be connected with the crime; nor does it mean that such proof must be sufficient to satisfy a reasonable mind beyond a reasonable doubt. See 16 C. J. 771-773, Sections 1578 and 1582, and Section 994; 23 C. J. S., Criminal Law, §§ 916, 918, 22 C. J. S., Criminal Law, § 567; State v. Sheffield, 45 Utah 426, 146 P. 306; State v. Johnson, 95 Utah 572, 83 P. 2d 1010.

The evidence of the State showed: That about January 1, 1936, Erwin became the Mayor of Salt Lake City; that on his recommendation Finch was appointed Chief of Police, taking office March 15, 1936. That houses of ill fame and gambling games and devices operated in open violation of the law, except during short intervals when pressure was being placed on the defendants to have them closed. Of course that, alone, does not prove that there was an agreement but it is a link in the chain of circumstantial evidence which tends to prove that. The women operators of houses of ill fame testified that from August 1st, 1936, to the first of the year of 1937 and from June 1, 1937, to February, 1938, they operated their businesses; that Officer Holt demanded that they pay him a certain sum monthly; that in order to operate they paid him. Officer Holt testified that Finch reorganized the police force when he became chief of police and that he, Holt, was appointed head of the anti-vice squad, on April 1st, 1936, and Finch told him at that time that he didn't care about vice, but not to let it run too openly. That about the 1st of June, 1936, Holt and Austin Smith and Finch and Erwin had a conversation, in which Smith said that he had heard that there was a pay-off in Salt Lake City, that the Mayor and Chief of Police were

accused of participating in it. The next day the Chief told
him to close up all forms of vice. That he kept them closed
for about a month, when, at Finch's suggestion, he allowed
them to open. That along the latter part of July, at the re-
quest of Finch, he went to see Abe Rosenblum, who operated
a card room. That Rosenblum told him to collect money
from the women operating houses of prostitution, and gave
him the places that were operating, and told him the amounts
that he was to collect from each one. That he went to these
places, told them that they had to pay, gave them the amount
thereof, and told them that he would be around the first of
each month to collect. That on the first of each month he
made the collection, the first being made August 1st, 1936,
That he took the money to Rosenblum. That he made these
collections from that time until January 1, 1937, when the
Chief told him again to close everything up and see that
there was absolutely no more pay-off. That at that time
there was considerable public criticisms of the way the city
was operated wide open. That in February Finch called
him in again and said that he, Holt, was causing the "heat"
and for that reason he was going to remove Holt from the
vice-squad, so that things would calm down, and that ac-
cordingly, on March 1, 1937, he was removed, and H. K.
Record was put in his place.

H. K. Record testified that about the middle of April,
1937, at Pearce's request by telephone, he went to Pearce's
office, and there Pearce said that he was responsible for
Record's being placed at the head of the vice-squad; that
the Mayor had instructed him to make collections from
gambling houses and other forms of vice; that they ex-
pected to collect about $1,700 per month, and offered to
pay Record $165 per month if he would make these collec-
tions. Record refused to have any part of it, and was re-
moved as head of the anti-vice squad on May 1st, 1937.

One Kempner, testified that some time in the spring of
1937, he went with Abe Stubeck, operator of a card room,
from one card room to another, where collections were

made and the money taken to Ben Harmon. Officer Holt further testified, that about two months after being removed as head of the anti-vice squad he was put back on the squad, under Captain Thacker. That in about ten days thereafter he went to Ben Harmon's restaurant and card room, at Harmon's request by telephone. That when he was there Harmon told him he was to collect from the houses of prostitution, giving him the places, and the amounts he was to collect from each, and told him to pick it up on the 1st of each month. He further said that he went around to the places, told the operators of his instructions, and made the collections accordingly, for the 1st of June, 1937, to and including January 1st, 1938. That he took the first collection to Harmon, who said to take it to Pearce's office that night, that when he went to Pearce's office Harmon was there with Pearce. That he laid the money, which amounted to About $500, on Pearce's desk, and Pearce put it in a drawer and asked him if that was all. That from then on he took the money to Harmon. That later, in September or October of that year, Harmon said to him that Pearce had accused him (Holt) of holding out; whereupon he went to Pearce's office, where Pearce checked with him a list of the places of prostitution and the amount which each one was paying. That Pearce then produced another list and asked him why he wasn't collecting from them. That Holt said that these other places were just private residences and the girls weren't making a living out of it, and that he wouldn't collect from them. That Pearce acquiesced in that statement and, when Holt left, told him he was doing a fine job.

About the middle of January, 1938, Harmon telephoned Holt and asked him to pick him up, which he did, and while driving around Harmon said:

"For *God* Sake, don't take any more collections; Harris and Lee got hold of Pearce and accused him of being in the pay-off. Don't take anything from any one any more, as things might blow over."

This evidence is sufficient to prove the corpus delicti. While there is no direct testimony of any express agreement on the part of the defendants to allow these illegal activities to operate, the only inference that can be drawn from the fact these operators paid the money to Holt and Stubeck under the circumstances detailed is that there was an understanding that they would be allowed to operate their illegal businesses. The operators of gambling houses and houses of prostitution do not pay police officers money for nothing. And the fact that they did pay indicates that they understood that they would be "protected" in their operations. This evidence shows that this was not merely a "shake-down" by a lone police officer, because he did not keep the money himself, but turned it over to Rosenblum, in the first case, and later to Harmon and Pearce. The evidence shows that about $500 was collected each month for a period of about six months at one time and eight months the last time. These facts do not lend themselves to a shake-down by an individual officer, but indicate an understanding by those higher up. This evidence shows Rosenblum, Stubeck, Holt, Harmon and Pearce, each taking an active part in the operation of this understanding, and the Chief of Police sending Holt to Rosenblum, ordering him to close up everything when the public pressure was on, telling him to open things up, as soon as Harmon had contacted him, and, from all intent and purpose, working under cover on this understanding. The testimony of Holt and the women operators show that for six months at one time and eight months for another houses of ill fame were allowed to operate openly, and also that money was collected for that purpose,—which shows two of the overt acts alleged. Thus the corpus delicti is amply proved.

It is contended that the testimony of Holt and the other accomplices cannot be used to prove the corpus delicti. This on the ground that extrajudicial declarations of an agent

may not be used to prove agency. Although, after agency has been proved by other evidence, such declarations may be used to prove other issues against the principal if he is a party to the action. There are two reasons for this rule: One is that the extrajudicial declarations, offered to prove the facts in such declarations asserted, are excluded by the hearsay rule. See Jones on Evidence, 4th Ed., 559, Sec. 297; 22 C. J. 194; Wigmore on Evidence, 2nd Ed., Sections 1360 to 1363. And until agency is proved such declarations are immaterial but become admissible as an admission or disserving statement of the principal, if he is a party to the action, when agency is proved. And it would be begging the question to admit the declarations of the agent because he is the agent of his principal, and then prove that he was in fact the agent of his principal because he so stated in his declaration.

In this case the same principal applies. Here a conspiracy is charged, and when it is proved, each conspirator becomes the agent of his co-conspirator, and the extrajudicial declarations of each conspirator, made in furtherance of the conspiracy, may be used against his co-conspirator, but not to prove the existence of the conspiracy. That fact must be proved by other evidence. And in a conspiracy case each accomplice is a co-conspirator, with all the others, and thus the existence of the conspiracy may not be proved by the extrajudicial declarations of a co-conspirator. Proof of the existence of the conspiracy is an essential element of the corpus delicti in the case and therefore may not be proved by the extrajudicial declarations of an accomplice. See Wigmore on Evidence, 2nd Ed., Sections 1048, 1078, 1079; Jones on Evidence, 4th Ed., Sections 235, 236, 248, 251, 254, 255 and 256; *Campbell* v. *Newton & Driskill,* 1915, 52 Okl. 517, 518, 152 P. 841; *People* v. *MacPhee,* 1915, 26 Cal. App. 218, 146 P. 522; *Terry* v. *United States,* 9 Cir., 7 F. 2d 28; *Witherow* v. *Mystic Toilers,* 42 Utah 360, 130 P. 58; *State* v. *Inlow,* 44 Utah 485, 141 P. 530, Ann. Cas. 1917A, 741; *Looney* v. *Bingham Dairy,* 75 Utah 53, 282 P. 1030, 73 A. L. R. 427.

But this does not prevent an agent or co-conspirator from testifying as a witness on the trial of any fact which is within his own knowledge which tends to prove any issue in the case. Of course, his testimony of his own declarations made in furtherance of the conspiracy, which had no ▮ other probative value except as admissions or disserving declarations of his co-conspirators who are defendants, would not be admissible to prove the conspiracy because that would beg the question. But he could testify of any acts, statements or circumstances within his knowledge, which of themselves constituted or tended to establish a conspiracy, or from which its existence might be inferred, the same as any other witness. Jones on Evidence, 4th Ed., Section 255; 16 C. J. 651 and 652, Section 1290; 22 C. J. S., Criminal Law, § 759; *People* v. *Zimmerman,* 3 Cal. App, 84, 84 P. 446; *Southern Surety Co.* v. *Gilkey-Duff Hardware Co.,* 1933, 166 Okl. 84, 26 P. 2d 144, 89 A. L. R. 888; *Mitchell* v. *McCollister,* 93 Okl. 203, 220 P. 631; *Citizen's Bank of Gans* v. *Mabray,* 90 Okl. 63, 215 P. 1067; *Exchange Bank* v. *Occidental Elevator Co.,* 95 Mont. 78, 24 P. 2d 126, 90 A. L. R. 740; *McGalliard* v. *J. D. Halstead Lumber Co.,* 130 Cal. App. 25, 19 P. 2d 802; *Mayfield* v. *Fidelity & Casualty Co.,* 16 Cal. App. 2d 611, 61 P. 2d 83; *Hiner* v. *Olson,* 23 Cal. App. 2d 227, 72 P. 2d 890, 73 P. 2d 945; *Rhodes* v. *Industrial Commission,* 99 Colo. 271, 61 P. 2d 1035; *Phelps* v. *Union Central Life Ins. Co.,* 105 Mont. 195, 71 P. 2d 887. The facts testified to by Holt and the other accomplices were not in any sense mere admissions by the defendants through these witnesses, but were facts which if true tended to establish the existence of the conspiracy.

Section 105-32-18 provides:

"A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient, if it merely shows the commission of the offense or the circumstances thereof."

This court has held this corroboration need not go to all the material facts testified to by the accomplice. (*State* v. *Stewart*, 57 Utah 224, 193 P. 855) ; that the corroborative evidence need not be sufficient in itself to support a conviction; it may be slight and entitled to little consideration. *People* v. *Lee*, 2 Utah 441; *State* v. *Spencer*, 15 Utah 149, 49 P. 302. But in *State* v. *James*, 32 Utah 152, 89 P. 460, the court held that an instruction to the jury using the words above was error.

On the other hand, the corroborating evidence must implicate the defendant in the offense and be consistent with his guilt and inconsistent with his innocence, and must do more than cast a grave suspicion on him, and all of this must be without the aid of the testimony of the accomplice. *State* v. *Lay*, 38 Utah 143, 110 P. 986, 987; *State* v. *Butterfield*, 70 Utah 529, 261 P. 804; *State* v. *Park*, 44 Utah 360, 140 P. 768; *State* v. *Kimball*, 45 Utah 443, 146 P. 313; *State* v. *Powell*, 45 Utah 193, 143 P. 588; *State* v. *Bridwell*, 48 Utah 97, 158 P. 710; *State* v. *Baum*, 47 Utah 7, 151 P. 518; *State* v. *Frisby*, 49 Utah 227, 162 P. 616; *State* v. *Elmer*, 49 Utah 6, 161 P. 167; *State* v. *Cox*, 74 Utah 149, 277 P. 972 ; and *State* v. *Gardner*, 83 Utah 145, 27 P. 2d 51.

The corroborative evidence of an accomplice, unlike proof of the corpus delicti, may consist in the admissions of the accused. *State* v. *Collett*, 20 Utah 290, 58 P. 684 ; *State* v. *Hansen*, 40 Utah 418, 122 P. 375; *State* v. *Stewart*, 57 Utah 224, 193 P. 855 ; and *State* v. *Gardner*, 83 Utah 145, 27 P. 2d 51.

A large portion of the evidence adduced at the trial was the testimony of accomplices, and unless this evidence is corroborated by other evidence which satisfied the above requirements, the case would have to be reversed. Keeping in mind these rules, we will examine the evidence as to each of the defendants and see if there is sufficient corroborating evidence to sustain his conviction.

First, we will consider the evidence of other persons who are not accomplices which tends to connect the defendant Erwin with the offense. Ben Hunsaker testified that Erwin owed him on a note for approximately $10,000; that during the latter part of March, 1936, while arrang- ■ ing to pay this note, Erwin said that he had the Public Safety Department assigned to him; that he had his Chief of Police; that he expected the Chief to bring him in good money, adding,—

"They all do it, and I am going to get mine while I have a chance."

About July 3, 1936, Erwin brought Hunsaker a payment of $200 in currency, and said:

"Ben, I have had one hell of a time getting things lined up. I have only a few gambling joints and bootlegging places running. Now I have pretty well women of the underworld lined up, and expect a lot of money to be coming in."

During the latter part of the summer of 1936, Erwin said to Hunsaker that he had his Chief of Police that was bring- ing him in good money, but not enough. Hunsaker said,

"They are going to get you," and Erwin answered, "They can't get me. Some one has to see me take the money. They can't do that, be- cause I don't collect."

About the same time the following year Erwin said to Hunsaker that he thought the Chief of Police was taking in a lot of money, but he didn't know that he (Erwin) was getting his right split, adding that he couldn't be down to the Chief's office watching him and tend to his own office at the same time; so he had to take just what the Chief handed him and be satisfied.

Erwin personally brought all the payments, except one, to Hunsaker in Ogden, in currency, and at one time Hunsaker asked him why he didn't write a check and mail it up, and Erwin replied:

"You don't think I am crazy enough to take $200 in currency to the bank and get a check for it? I don't intend to let them fellows know what I am doing."

This testimony was partially corroborated by Clifford Hunsaker, who was present during the first conversation.

Mrs. W. G. Runzler testified that she and Mrs. Earl Van Cott and Mrs. Lee Wright visited the Mayor at his office on January 14th, 1937, and that while there Mrs. Van Cott stated to the Mayor that, according to information she had received, Mr. Erwin was receiving a pay-off of $750 per month. The Mayor flushed considerably, and said,

"Oh, I am accused of that, too, am I?"

and he then took a cigarette and asked if he might smoke, and changed the subject.

Fisher Harris testified that on January 20, 1938, at the Alta Club, in the presence of a Mr. Fish and other newspaper men and Erwin and Finch, he, Harris, in response to questions by Mr. Fish, said that he had made an investigation of illegal activities in Salt Lake City and had made a complete report of this matter in writing to Mr. Erwin. He then enumerated the items thereof and stated the amounts that each was paying, and said:

"Of course Mr. Erwin gets $750 per month and Mr. Finch gets $500 per month,"

and that neither Mr. Erwin nor Mr. Finch said anything at the time. That at various times later during the conversation both Mr. Finch and Mr. Erwin stated that this was the first time that they had ever heard anything of a pay-off situation in Salt Lake City.

It is urged that these admissions on the part of Erwin do not tend to show that he was a party to the same agreement as is shown by the testimony reviewed in the discussion on the corpus delicti. But Pearce said to Record that the Mayor had requested him to make collections. The tes-

timony of Hunsaker fits in very well with the other events. Hunsaker first talked with Erwin the latter part of March, shortly after Finch was appointed Chief of Police. Erwin said he expected his Chief of Police to bring him in good money, indicating that he had in mind an arrangement between the Chief of Police and the underworld. In July, about four months later, Erwin said he was having a hard time to get things lined up. This was about the time that Austin Smith told the Mayor and the Chief of Police that they were being accused of participating in the pay-off and Finch ordered Holt to close everything up. Later in the summer Erwin told Hunsaker that the Chief of Police was bringing in good money, but not enough, and indicated that he was doing this under cover so that he would not be seen taking the money. This was about the time when Holt was collecting regularly from the women, from August 1st, 1936 until the first of the next year. Then later, about the same time the following year, at the time when Holt was collecting regularly from the women, Erwin said that he thought the Chief of Police was taking a lot of money, but he didn't know that he was getting his share. This evidence, if true, shows that Erwin had in mind collecting from the operators of the underworld when he first selected his Chief of Police; that later he stated that he was getting money from that source, indicating that he was getting it carefully and under cover by his statement that they didn't see him take the money and by the fact that he was bringing the money in currency to Ogden. His statements coincide exactly with the times when Holt was making his collections, and the evidence tends very strongly to connect Erwin with the same understanding between Holt, Stubeck, Harmon, Pearce and the women of the underworld, and is sufficient to connect the defendant Erwin with this offense.

Taking next the evidence which tends to connect Pearce with this offense, other than the testimony of the accomplices, we have as follows: The testimony of H. K. Record, as heretofore stated, where Pearce asked him to make col-

lections. The testimony of Fisher Harris, that he told Pearce that he had been making an investigation of illegal activities in Salt Lake City and the official connections with them and the pay-off and that he knew that Pearce was involved in that matter with Harmon and others, and suggested that it would be to Pearce's interest to make a complete disclosure to him of all he knew on the subject, and that when he first made this statement Pearce sat there and said nothing for about a minute or two, but ultimately said,

"Who says I am involved in this thing?"

and that when Harris answered that the name of the one who accused Pearce was among those he would mention, that after mentioning the names of about 15 persons when he came to the name of H. K. Record, Pearce said that Record had it in for him. Later Pearce said that he might help stop the pay-off, as he was Harmon's attorney. During the conversation Pearce said he knew nothing about the situation.

The testimony of Record clearly indicates that there was an understanding between Pearce and his associates to allow the violation of law for money. There is no other way that those incidents can be explained. He asks Record, the head of the anti-vice squad, to make the collections from the operators of gambling houses and other places of vice, and offers to split the $1,700 which he expected to collect, by giving Record $165 per month thereof. It is obvious that there could be no collections from these operators without an understanding that their places would be allowed to operate. This indicates that there was some one involved who had power to promise protection, and the small portion of the expected collections offered to Record indicates that there were many others to divide the money with. Those incidents took place about the same time that Stubeck made his collections, and a short time before Holt was first in Pearce's office,—indicating that this is a part of one under-

standing. This clearly is sufficient to connect the defendant Pearce with the offense charged.

The evidence, other than the testimony of accomplices, which tends to connect Finch with the offense charged, is the same as in the case of Erwin, as to the testimony of Fisher Harris. In addition thereto Austin D. Smith testified that shortly after Finch's appointment as Chief of Police he went to Finch's home and while there he asked Finch what the pay-off was, and Finch said,

"Approximately $2,000,"

and added that Abe Rosenblum would probably collect it because he had had experience along that line. Smith further testified that in June, 1936, at a meeting between Smith, Holt, Erwin and Finch, he asked Holt to tell Erwin and Finch what Holt had told him a few days before in Taggert's office in the Federal Building, whereupon Holt said that he had informed Smith that there were vice conditions and a pay-off going on from houses of prostitution and gambling houses and other vice conditions, that it was rampant all over town. That nearly everyone knew about it up and down Main street, and that they had called Smith over there because this information ought to be given to the Mayor, and Finch reprimanded him saying,

"We should not be washing our dirty linen in the enemy's camp."

O. B. Record testified that while Thacker was the head of the anti-vice squad, he made an arrest at Bill Browning's for gambling, and shortly thereafter Finch said to him to let Thacker handle the arrests, and if complaints came in to him to let Thacker know about it.

Around Christmas in 1937, Finch told officer E. A. Hedman, according to Hedman's testimony, that Thacker had a grievance with Hedman, and Thacker then spoke up and asked why Hedman had ordered a raid on a gambling place, and said that others should not make raids, but should leave

a note on Thacker's desk giving information on gambling, and let him do the arresting.

L. D. Hayes testified that in the latter part of November, 1937, he talked with Finch, and said,

"Mr. Finch you must know that gambling is going on in these places, either under protection or without regard to the law,"

and Finch answered that he knew that gambling was going on, but he was going to do nothing about it.

The evidence shows that when Finch was made Chief of Police he appointed Holt as head of the anti-vice squad on April 1, 1936. On March 1, 1937, after there had been considerable agitation, Holt was removed from the head of the anti-vice squad, and was succeeded by H. K. Record. Record was approached by Pearce to collect from gambling places and refused to have anything to do with it, and was removed by Finch. Shortly thereafter Thacker was placed in his place, and Holt was put back on the anti-vice squad.

Between the middle of April and the end of May in 1936, John S. Early, who was then the office manager of the Public Safety Department, told Finch

"that there are rumors that there is considerable pay-off going on," and Finch answered, "Those people know their own business and will have to operate their own business and I will operate the police department."

We have already noted, that the fact that Pearce asked Record to collect $1,700 per month, and only offered him $165 for making the collections, indicates that there were others involved, who had the power to promise and give protection to the operators, and to share in the division of the collections. It would be almost impossible to make such an arrangement, as Record testified Pearce was trying to make without the cooperation of the Chief of Police. And, on the other hand, we have the testimony of Hunsaker, that during this time, Erwin was saying to him that he had his Chief of Police who was bringing him in good money.

And while this evidence was admitted, only as an admission against Erwin, still the fact that Erwin was collecting money from the underworld, and that he had the power to hire and fire the Chief of Police, is a circumstance which tends to prove that the Chief of Police was a party to this arrangement. These facts together with the fact that Finch told Austin Smith, that there was a pay-off, and that Abe Rosenblum would probably collect it, and later when Smith called it to his attention that the pay-off condition was rampant all over town, Finch reprimanded him saying,

"We should not be washing our dirty linen in the enemy's camp";

and the fact that Finch told O. B. Record and Hedman, on different occasions, to not arrest gamblers but to tell it to Thacker if they had complaints; and the fact that he told Hayes, that he knew gambling was going on but he was going to do nothing about it; and the fact that he told Early, in substance, to mind his own business, when vice conditions were called to his attention, together with the fact that he removed Holt from the anti-vice squad after much pressure, and placed H. K. Record in his place, but removed him soon after he refused to make collections, and placed Holt back on the squad under Thacker, all tend to show that Finch was connected with this offense. And while none of this evidence is as direct as the evidence as to the other defendants, still, taking it all together, it is sufficient to satisfy the statute.

In order to sustain a conviction, the evidence must not only show the corpus delicti independent of the admissions and connect each defendant convicted with the offense charged, without the aid of the testimony of an accomplice, but also must be of such persuasive force that the mind might be reasonably satisfied of all the necessary facts constituting the defendant's guilt beyond any reasonable doubt; and where the proof of a necessary fact is dependent solely upon circumstantial evidence, such circumstances must be such as to reasonably exclude every

reasonable hypothesis other than the existence of such fact and be consistent with its existence and inconsistent with its non-existence. It is not necessary that each circumstance in itself establish the guilt of the defendant, but the whole chain of circumstances, taken together, must produce the required proof. *State* v. *Crawford,* 59 Utah 39, 201 P. 1030; *State* v. *Marasco,* 81 Utah 325, 17 P. 2d 919; *Terry* v. *United States,* 9 Cir., 7 F. 2d 28; *State* v. *Burch,* 100 Utah 414, 115 P. 2d 911.

On the other hand, if there is any substantial evidence which satisfies the above requirements, then the weight of the evidence is for the jury, and the court will not disturb the verdict. *State* v. *Lewellyn,* 71 Utah 331, 266 P. 261; *State* v. *Odekirk,* 56 Utah 272, 190 P. 777.

The evidence shows that shortly after Finch had been appointed Chief of Police Erwin told Hunsaker he had been assigned to the Department of Public Safety and he had his Chief of Police, whom he expected to bring in good money, because he was going to get his while he had a chance. He was told by several persons that there was a pay-off, and he asked them to get him all the information they could about it. Two persons gave him detailed reports on the subject, and about that time Finch said to Smith that there was a pay-off of about $2,000 a month; that Abe Rosenblum would probably collect it, as he had had experience in that line. That Finch reorganized the anti-vice squad, placing Holt at its head, and told him he didn't care about vice, but not to let it run too openly. In the latter part of June, 1936, Smith told Finch and Erwin that there were rumors that there was a pay-off in which they were participating. Finch then ordered Holt to close all gambling houses and houses of prostitution. About this time Erwin told Hunsaker that he was having a hard time to get the gambling places and the women lined up but expected things to be better soon. Along about the end of that month Finch told Holt to let the vice operators open

up again, and then told him to go and see Abe Rosenblum, who told him he would have to collect from the women, giving him the places he was to collect from and the amounts to be collected from each place. Holt then went around to these places and told them they would have to pay, and the amounts for each place; that he would be around to pick it up on the first of each month. He made his first collection August 1, 1936, and continued to collect up to January, 1937. He turned his money over to Rosenblum. About this time Erwin told Hunsaker that the Chief of Police was bringing him in good money, but not enough. After the first of 1937 the women's clubs began agitating against the wide-open condition of the city. The Chief of Police again told Holt to close everything up, and to see that there was no more pay-off. Some time in February of that year Finch told Holt that he, Holt was the cause of the "heat," and that he was going to remove him so that things would calm down. Thereafter Holt was removed from the anti-vice squad, on March 1st, 1937, and H. K. Record took his place. In April Record was called to Pearce's office, where Pearce asked him to make collections from the gambling places and other places of vice. This Record refused to do, and on May 1st he was removed from the anti-vice squad, and Thacker succeeded him. About this time Stubeck made collections from the card rooms, and gave the money to Harmon. In May Holt was transferred back to the anti-vice squad, under Captain Thacker, and was given charge of the prostitutes. Harmon sent for him by phone and told him to collect from the women, giving him the places and the amounts to be collected from each place. Holt again went around to the women and told them that they would have to pay and that he would collect on the 1st of each month. He made these collections beginning on the 1st of June and continued each month to January, 1938. He took the first payment to Harmon, who told him to take it to Pearce. When Holt came to Pearce's office with the money, Harmon was there. Holt placed the money on the table,

and Pearce put it in a drawer and asked if that was all. The later payments he gave to Harmon. Some time thereafter Harmon told Holt that Pearce claimed Holt was holding out on them; whereupon Holt went to Pearce's office. While there they checked over the amount he was collecting, and Pearce asked him why he didn't collect from some other places, but Holt answered that they were not making a living out of it, and when he left Pearce told Holt he was doing a fine job. During the latter part of the summer of 1937 Erwin told Hunsaker that the Chief of Police was bringing in a lot of money, but he did not know that he was getting his right cut. In the latter part of 1937 Fisher Harris made an investigation of the illegal activities in Salt Lake City, and early in January, 1938, made a report in writing to Erwin, and at some time or other accused each of the defendants of being in the pay-off. The answer of each of the defendants to this accusation was somewhat equivocal. Immediately thereafter Harmon told Holt to close everything. Finch was thereupon removed as Chief of Police by the City Commission, and shortly thereafter Erwin resigned as Mayor.

This is but a brief outline of the main points of the evidence. Some of this evidence is more fully discussed in other parts of the opinion, but it gives the main points upon which the State relies. It shows a consistent plan on the part of the Mayor when he took office to get his while he had a chance, and with this in mind he chose the Chief of Police; that he conceived that if no one saw him collect the money they couldn't get him, and for that reason they had a go-between to deal with the men who actually collected, first using Rosenblum and then later Harmon and Pearce. That they allowed houses of prostitution and gambling places to run as openly as they dared, closing them only when the public demanded a clean-up, as soon as the pressure was over allowing them to open again. If the jury believed this testimony, there is ample evidence from which they might be satisfied beyond any reasonable doubt of the guilt of each

of these defendants, and the court did not err in submitting it to the jury.

Defendants urge that houses of ill fame have always operated and always will, regardless of whether the officers of the law agree thereto or not. And that the fact that they did operate does not prove anything. It is true that that fact alone does not prove an agreement to allow them to operate. But even though it is hard to prevent such places from operating, still the operators often pay the officers of the law for permission to operate without undue molestation. And it is a criminal offense when they operate under such an agreement.

There is no allegation in the indictment that the operators were parties to this agreement; nor is there an allegation that they agreed to pay for the permission to operate, but it is not necessary for the indictment to allege all of the agreement. It is only necessary for it to allege sufficient facts to constitute the offense. The fact that the proof shows more than was alleged does not constitute a variance or make it another conspiracy than that charged in the indictment, as long as the evidence proves the facts alleged.

But defendants contend that the evidence, if it tends to prove any conspiracy at all, proves several small conspiracies and not one general conspiracy, as charged in the indictment. They contend that evidence which shows that Finch sent Holt to Rosenblum, who told him to collect from the women, and his collection from August, 1936, to January, 1937, and giving the money to Rosenblum, while he was chief of the anti-vice squad, had no connection whatever with and was a separate conspiracy from Holt's collection under Harmon and Pearce, from June, 1937, to January, 1938. They also contend that the collections made by Stubeck in the spring of 1937 from the card rooms, if it proves any conspiracy, at all, shows another isolated conspiracy and is not in any way a part of the general conspiracy charged. We have already pointed out that

the evidence here tends to show one general conspiracy and held that it was ample to show a general plan conceived originally in the mind of the Mayor, and the various incidents showed the carrying out of that plan, and that the evidence amply jusified the verdict.

But counsel further contend that even though the evidence is sufficient to justify the verdict, it is also susceptible to the construction which they place upon it, and was therefore a question of fact for the jury, and that the court should have left it to the jury, by proper instructions to that effect. Thus they assign as error the refusal of the court to give Pearce's proposed instructions 3-A, 4, and 5. If the views expressed in this opinion are correct, proposed instructions 3-A, and the part of 4 which was not given, were properly refused, as they are clearly a misstatement of the law.

Pearce's proposed instruction 5 in effect tells the jury that even though they believed that there was an understanding between Holt and Rosenblum in 1936 to collect from houses of prostitution, or though they believed that there was some agreement between Holt and Harmon in 1937 to collect money from prostitution, or even though they believed that there was some agreement between Stubeck and Harmon in 1937 to collect money from the card rooms and were satisfied that some of the defendants "entered into one or more of these separate agreements, if you believe them to be such," that they could not convict any of the defendants. This instruction tells the jury that the incidents pointed out, if believed, were separate agreements, and if the jury believed them to be such they could not convict any of the defendants. It did not properly leave to the jury the question of whether or not these incidents constituted separate agreements or whether they were merely a part of one general agreement, but told the jury directly that they constituted separate agreements, and then further stated that if the jury believed them to be separate agreements they could not convict either of the

defendants. And thus this instruction was properly refused.

Even though this evidence was susceptible of the interpretation that these incidents constituted separate agreements and were not parts of one general agreement, still the court did not commit material error in refusing to so instruct the jury. Counsel cites cases which hold that,

"Where one large conspiracy is charged, proof of different and disconnected smaller ones will not sustain a conviction." *Telman* v. *United States*, 10 Cir. 67 F. 2d 716, 718; *Tinsley* v. *United States*, 8 Cir., 43 F. 2d 890; and *Wyatt* v. *United States*, 3 Cir., 23 F. 2d 791.

All these cases are federal cases, and were expressly overruled by the Supreme Court of the United States in the case of *Berger* v. *United States*, 295 U. S. 78, 55 S. Ct. 629, 630, 79 L. Ed. 1314, where the court, speaking of the above quoted rule, says:

"* * * This view, however, ignores the question of materiality; and should be so qualified as to make the result of the variance depend upon whether it has substantially injured the defendant.

"In the present case, the objection is not that the allegations of the indictment do not describe the conspiracy of which petitioner was convicted, but, in effect, it is that the proof includes more. If the proof had been confined to that conspiracy, the variance, as we have seen, would not have been fatal. Does it become so because, in addition to proof of the conspiracy with which petitioner was connected, proof of a conspiracy with which he was not connected was also furnished and made the basis of a verdict against others?"

Under this decision, even if the jury were of the opinion that each of the indictments above set out proved a separate agreement between the parties thereto and that all were not connected in a common design, it still would not be prejudicial error for the court to refuse to instruct the jury to that effect, as long as they found that there existed the kind of agreement alleged and that it occurred within the time and place alleged. In the case of *Lefco* v. *United States*, 3 Cir., 74 F. 2d 66, 68, the court, on this subject, said:

"There is nothing new in this defense of multiple conspiracies and nothing uncertain in the law arising from such a defense. Of course, to sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not sustain the verdict. * * *

"Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same, unlawful result. *Allen* v. *United States*, [7 Cir.], 4 F. 2d 688, 691; *McDonnell* v. *United States*, [1 Cir.], 19 F. 2d 801; *Capriola* v. *United States*, [7 Cir.], 61 F. 2d 5, 9; *Williamson* v. *United States*, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278; *Pierce* v. *United States*, 252 U. S. 239, 243, 40 S. Ct. 205, 64 L. Ed. 542. All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the conspiracy. Those who come [in] later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before. *Van Riper* v. *United States*, [2 Cir.], 13 F. 2d 961; *Coates* v. *United States*, [9 Cir.], 59 F. 2d 173. Nor does the mere fact that conspirators individually or in groups perform different tasks to a common end split up a conspiracy into several different conspiracies. *United States* v. *McConnell* (D. C.) 285 F. 164; *Wilson* v. *United States*, [2 Cir], 190 F. 427."

Under these rules the evidence tends to show one general conspiracy, but even if it is susceptible to the interpretation that there were more than one unconnected conspiracy, each of them was of the same kind as alleged in the indictment, and therefore the defendants were convicted of the same kind of a conspiracy which took place within the same time and place alleged, and there was no prejudicial error in refusing to so instruct the jury.

On the question of the admissibility of evidence, there is no merit to defendants' contention that testimony of the operation of houses of prostitution and of gambling games and devices was inadmissible. The indictment alleged as an overt act that during certain periods the defendants permitted, allowed, assisted and enabled these houses and gambling games and devices to operate. One im-

portant element of that allegation is that such places and devices did operate. And that allegation of the indictment cannot be proved without proof that they operated. It is true that the fact that such places and devices did operate does not in and of itself have any tendency to prove that there was an agreement to allow them to operate. But, aside from proving an element in one of the overt acts alleged, this fact is one link in a chain of circumstantial evidence which, when taken together with other facts, produced proof of the guilt of the defendants. The fact that these places and devices operated gives, meaning to other facts which otherwise would be meaningless. This evidence was therefor admissible. To this effect see *Helton* v. *Commonwealth*, 245 Ky. 7, 53 S. W. 2d 189, 190, where it is said:

"A conspiracy is almost necessarily established by welding into one chain circumstances which when considered separately are of themselves insufficient and inconclusive, but when connected and examined as a whole, are sufficient to show it."

A more serious question is whether the court erred in allowing witnesses to give in evidence conversations between a witness and one of the defendants, wherein the witness said that he had been told, or had made investigations and found, that vice was operating wide open in Salt Lake City, and that the operators were paying the city officials for the privilege to operate, and that such defendant was participating in the pay-off. All of these conversations, except those testified to by Fisher Harris, took place during the time of the conspiracy, and most of them long before its end. It is alleged in the indictment that the defendants well knew that these places and devices were operating, and proof of this knowledge was a necessary element of the State's case. The fact that some one told these defendants that these places were operating in Salt Lake City does not prove that they were operating, but it does tend to show that the defendants were put on notice that those conditions existed, and thus the evidence

was admissible. Again, this knowledge is also a link in the chain of circumstantial evidence which, taken with other facts, tends to show the guilt of the defendants.

There were two types of conversation testified to by Fisher Harris: One in which he stated that he had made an investigation; that he had found vice conditions operating wide open in Salt Lake City; that city officials were receiving money for allowing this operation, ■ and then directly accusing the defendant with whom he was talking of being connected with this situation. In these conversations he further stated that upon the making of this accusation the defendant with whom he was talking remained silent, but later in the conversation such defendant made some sort of a denial. In this class is the conversation with Erwin and Finch at the Alta Club, and the conversation with Pearce at Lee's office. The conversation testified to by Mrs. Runzler, with Erwin, though admissible on the ground that it shows knowledge, also comes within this class.

On the question of whether such conversations are admissible in evidence, Professor Wigmore, in his work on Evidence, Second Edition, Section 265, says:

"It has already been pointed out that a second chief sort of evidence for proving that mental state which is termed Knowledge, Belief, or Consciousness, consists of Conduct of the person to whom the mental state is attributed * * *. The basis of the inference here, as elsewhere, is our experience of the operation of human nature. The general principle of Relevancy applies, that the evidual fact should be received whenever the 'factum probandum' is at least a fairly possible or probable inference, though not the conclusive or most probable one."

Section 267.

"* * * There is, however, a large class of cases where the belief or knowledge or consciousness is of service only evidentually, as forming a second step of the inference to some other fact, which forms the ultimate object of proof."

### Section 273.

"It has already been seen that one of the common and established uses of the mode of reasoning here involved is the inference from the guilty conduct to the commission of the guilty deed; * * * the real opening for controversy arises in the first step of the inference, and not in the second. No one doubts that the state of mind which we call 'guilty consciousness' is perhaps the strongest evidence that the person is indeed the guilty doer; nothing but a hallucination or a most extraordinary mistake will otherwise explain its presence. But in the process of inferring the exstence of that inner consciousness from the outward conduct there is ample room for erroneous inference; and it is in this respect chiefly that caution becomes desirable and that judicial rulings upon specific kinds of conduct become necessary."

"In general, it may be premised, any and all conduct may be opened to this inference. The kinds of behavior which may properly suggest such a cause are beyond enumeration; they are as various and as changeable as men's dispositions and emotions. No conduct is conclusive; but, on the other hand, no conduct is entirely without significance greater or less according to the circumstances:"

### In 80 A. L. R. 1236, on this subject, it is said:

"* * * The crystallization of the experience of men shows it to be contrary to their nature and habits to permit statements tending to connect them with actions for which they may suffer punishment to be made in their presence without objection or denial by them, unless they are repressed by the fact that the statement is true. Consequently, silence under accusation is some evidence from which the jury may infer that the accused acquiesced in the statement and admitted its truth."

### Under the same note, at page 1249, it is said:

"* * * An evasive answer or one unresponsive to the declaration is tantamount to absolute silence, and when not amounting to a denial or an express admission renders admissible both the statement and the reply, under the rule as to tacit admissions."

### In Underhill on Criminal Evidence, 4th Edition, Section 250, Page 465, it is said:

"Any Statement or conduct of a person, indicating a consciousness of guilt, where at the time or thereafter he is charged with or suspected of the crime, is admissible as a circumstance against him on his trial.

Evidence of circumstances, which are a part of a person's behavior subsequent to an event with which it is alleged or suspected he is connected with or implicated in, is relevant if the circumstances are such as would be natural and usual, assuming the connection or implication to exist."

On the question of admissibility of evidence this court has held, in harmony with the above quotation, that:

"To be relevent and admissible, it is not essential that proffered evidence be by itself sufficient to establish a disputed point or fact in issue, nor is it required to be addressed with positive directness to such point or fact. It is receivable if it by itself, or in connection with other evidence, renders probable or improbable, or logically tends to prove or disprove, a disputed point or fact in issue." See *State* v. *Inlow*, 44 Utah 485, 141 P. 530, 534, Ann. Cas. 1917A, 741; *State* v. *Tidwell*, 44 Utah 248, 139 P. 863; *State* v. *Burno*, 200 N. C. 142, 156 S. E. 783, 80 A. L. R. 1229, and a long note, which is above quoted from, commencing at page 1235.

In the case of *State* v. *Mortensen*, 26 Utah 312, 73 P. 562, 633, this court held that where the defendant was accused of murder and he dropped his head and said nothing, the relation of this conversation was admissible. It has also been repeatedly held that where the defendant gives an evasive or unresponsive reply to an accusation, when not amounting to a denial is admissible as tantamount to silence. *Turner* v. *State*, 17 Ala. App. 514, 85 So. 849; *People* v. *Swaile*, 12 Cal. App. 192, 107 P. 134; *People* v. *Wilson*, 61 Cal. App. 611, 215 P. 565; *Kingsbury* v. *People*, 44 Colo. 403, 99 P. 61; *State* v. *Kidd*, 24 N. M. 572, 175 P. 772.

Thus if, under the common experience of man, the statements and actions of these defendants, in the conversations detailed by the witnesses when they were accused or it was intimated that they were connected with the situation described, were not the actions of a person who believed himself to be innocent of such connections, but, on the contrary, were actions and conduct of a person who believed himself guilty of such connections, then this evidence was admissible, and the jury might, if they were

satisfied that the testimony was true, and believed, from their own experience of human reactions under such circumstances, that it showed a guilty consciousness, infer therefrom the guilt of the defendants. Because, as stated by Wigmore, above, only an hallucination or a most extraordinary mistake will otherwise explain such belief. It should be kept in mind in this regard that every act a person does and every statement he makes is the result of the state of his mind; that a person's mind is very complicated, and that different persons react in a different manner to the same situation; that there can be no set rules laid down as to how a person will act under certain circumstances; that every person has had experience from which he can to some extent determine the state of a person's mind from his actions,—and that all the surrounding circumstances should be taken into consideration. And if, from all of the facts and circumstances in a given case, we can say that the actions of the accused, keeping in mind human experiences, tend to indicate a guilty consciousness, then the evidence is admissible; but the weight to be given to such evidence is a question for the jury to determine.

The conversation, testified to by Mrs. Runzler, with Mr. Erwin, comes squarely within this rule. When the accusation was made he flushed considerably, and said:

"Oh, I am accused of that too, am I";

and immediately changed the subject. It is a well-recognized fact that when a person holding the position which Mr. Erwin held at that time, as Mayor of a large city, is accused by one of his constituents, as testified by Mrs. Runzler, and he is not guilty of that accusation, he will usually be very positive in his denials of guilt. Instead of that, here he passed the matter off very lightly and made no denial of the accusation. This evidence was therefore clearly admissible.

The making of false statement, by the accused, when accused of a crime, has been repeatedly held to be admissible in evidence to show guilty consciousness, together with all of his actions, his language and attitude toward the crime and those engaged in endeavoring to detect the criminal, when they tend to connect him with the commission of the offense. *People* v. *Conroy,* 97 N. Y. 62; *Wilson* v. *United States,* 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090; *People* v. *Zabriski,* 135 Cal. App. 169, 26 P. 2d 511; *People* v. *Peccole,* 92 Cal. App. 470, 268 P. 473; *Commonwealth* v. *Jones,* 297 Pa. 326, 146 A. 905; *People* v. *Sprague,* 52 Cal. App. 363, 198 P. 820; *State* v. *Zullig,* 97 Or. 427, 190 P. 580.

The conversation with Erwin and Finch at the Alta Club comes within the above rules. When Harris made the accusation that Erwin was getting $750 a month and Finch was getting $500 a month of the pay-off, neither of them said anything. Counsel argues that there is no evidence that they heard the accusation. The circumstances described would make it almost impossible for them not to hear what was said. It is true that on cross-examination Harris said that he probably wrote the figures "750" and "500" on a piece of paper and showed them to Mr. Fish, sitting next to him; but this does not contradict his original testimony, nor in any way indicate that the defendants might not have heard the accusation. But several times during the conversation both Erwin and Finch said that this was the first time that they had ever heard of a pay-off situation in Salt Lake City. That is not a direct denial that they were receiving a part of the pay-off, but if this statement were true then the accusation must be untrue. However, this statement, as far as Finch is concerned, is admittedly untrue, and the evidence is absolutely conclusive that each of these defendants had been hearing of a pay-off situation in Salt Lake City over and over again all during the time that they held office. Later in that meeting Finch agreed to resign, but afterwards refused to go through

with it, and very shortly thereafter Erwin handed to Fisher Harris his resignation, and later did resign from his office. These facts have a tendency to show that the defendants believed the accusation to be true. They are clearly not the actions of men who are entirely free from guilt.

The conversation at Lee's office, between Fisher Harris and the defendant Pearce, also was admissible under the above rule. In that conversation when the accusation was made Pearce said nothing for two or three minutes. Then he said:

"Who says I am connected with this thing?"

When Harris named a number of names, stating that the person who accused him was among them, on the mention of the name of H. K. Record, Pearce said Record had it in for him. In view of Record's testimony, this statement is significant. During the conversation Pearce denied having any connection with the situation, but, when urged to tell all he knew, he said he would talk to Harris later, and later, when contacted over the telephone, made the same statement. Everything which Pearce did after being accused was unusual for an innocent man, and, under the common experience of persons under those circumstances, were consistent with and had a tendency to show that he was connected with the situation. This evidence was therefore admissible.

The other type of conversations testified to by Fisher Harris were where Harris informed the defendant that he had made an investigation, found vice operating openly, and a pay-off to city officials, but did not directly accuse the defendant with whom he was talking, of being connected with the situation. In this class are the conversations with Erwin and Finch prior to their meeting at the Alta Club. In these conversations Harris did not directly accuse the defendant he was talking with of being connected with this offense. Thus they were not called upon to deny this connection. There is nothing in

particular in the conversations with Finch which indicate his guilt, and they are only admissible as a background for what happened at the Alta Club. But this conversation with Finch prior to their meeting at the Alta Club does show positively that Finch's statement that he had never heard of the pay-off situation before, which he made at the Alta Club, was untrue; and so this conversation was admissible. The conversation with Erwin prior to the conversation at the Alta Club was also admissible, on the same grounds; but, in addition thereto, it has a strong tendency to show his connection with the situation, because, even though he was not directly accused of being connected with the situation, his answer to the statements by Harris and to the written report which was showed to him clearly indicated that he had no interest whatever in whether or not the law was enforced. Also, he was not interested at all in bringing to justice those who were receiving the money which was being collected by the pay-off, because he made no inquiry whatever as to who was receiving the money, but merely suggested that it would be a good idea for the City to get the money, rather than some officer. And, thus this instance was also admissible in evidence.

It is, however, urged very strongly by the defendants that the contents of the letter in which Fisher Harris, reported to Mayor Erwin the places which were running openly in violation of law and that there was a pay-off was improperly stated to the jury. This letter, although the contents thereof were stated to the jury, was not received in evidence. However, the fact that it was handed to Mr. Erwin by Fisher Harris and the contents thereof were discussed in their various conversations, showing that Erwin knew the contents thereof, and the fact that it was the basis of the statement made by Fisher Harris at the Alta Club, makes it clearly admissible in evidence. Certainly if a witness can state orally what he said to a person, he can also prove a written statement which he handed to the person at the time. And the court did not

err in allowing the contents thereof to be stated to the jury.

Counsel further contend, that all of the testimony hereinbefore discussed and, in addition thereto, the testimony of Holt and Record, as to their dealings with Pearce, and practically all of the testimony received, was not admissible in this case. As nearly as can be determined, they argue that since this evidence did not exclude every reasonable hypothesis other than that of the guilt of the defendants, it was not admissible. The cases they cite are almost invariably dealing with the weight to be given to the evidence, rather than its admissibility. The question of the weight of this evidence has already been discussed. On the question of admissibility the only question is whether it tends to show the probability of this agreement or some other element of this offense. The testimony referred to involved Mr. Pearce, and showed him collecting the payoff from the officers who collected from the operators, and giving the collecting officer directions as to how, when, and where to make those collections, claiming responsibility for changes in the police force. In other words, it shows Mr. Pearce actively directing the collection of this pay-off money from the operators, and places him definitely as the go-between, between the higher-ups and the underworld. This testimony tends to connect Pearce with the conspiracy and it was clearly admissible in evidence.

It is further contended, that the court erroneously allowed witnesses to testify of declarations of other persons against certain of the defendants, which were not made in the presence of the such defendants, but which tended to implicate them in the conspiracy. And under this contention they claim that the testimony of Hunsaker that Erwin said he would make a lot of money because he had his Chief of Police, that he might not be getting his full split from his Chief of Police, that they couldn't get Finch, because he didn't collect, was improperly used against Finch. That the testimony of Holt that Harmon told him that Harris had accused Pearce of being in on the pay-off was im-

properly used against Pearce. That the testimony of Kempner, that Stubeck told him that Harmon was dividing the money with Erwin and his crowd, was improperly used against Erwin and the other defendants. And that the testimony of Record, that Pearce told him that Erwin had instructed him to make collections, was improperly used against Erwin.

The acts and declarations of a conspirator, when said or done in furtherance of the conspiracy and during its continuance, are admissible in evidence, when it is shown that a conspiracy exists and that the defendant against whom the evidence is offered and the person making the declarations are parties to the conspiracy. Each conspirator being the agent of his co-conspirator; his statements in furtherance of such conspiracy are binding on all. 16 C. J. 647, Sec. 1287; 22 C. J. S., Criminal Law, § 756, *Smith* v. *State,* 47 Ga. App. 797, 171 S. E. 578; *People* v. *Irwin,* 77 Cal. 494, 20 P. 56; *State* v. *Hopkins,* 68 Mont. 504, 219 P. 1106; *People* v. *Linde,* 131 Cal. App. 12, 20 P. 2d 704; *Delaney* v. *United States,* 263 U. S. 586, 44 S. Ct. 206, 68 L. Ed. 462; *International Indemnity Co.* v. *Lehman,* 7 Cir., 28 F. 2d 1, certiorari denied in 278 U. S. 648, 49 S. Ct. 83, 73 L. Ed. 561; *State* v. *McCurtain,* 52 Utah 63, 172 P. 481; *State* v. *De Angeles,* 72 Utah 209, 269 P. 515.

While the declarations of an agent or a conspirator may be used against his principal or co-conspirator, when that relationship is established by proper evidence, agency by reason of being a co-conspirator cannot be proved by the declarations of the agent. *State* v. *Inlow,* 44 Utah 485, 141 P. 530, Ann. Cas. 1917A, 741; *Witherow* v. *Mystic Toilers,* 42 Utah 360, 130 P. 58; *State* v. *Barretta,* 47 Utah 479, 155 P. 343; *State* v. *Gillies,* 40 Utah 541, 123 P. 93, 43 L. R. A., N. S., 776.

The testimony of Record that Pearce told him that Erwin had instructed him to make collections is a direct statement by Pearce that he was acting as agent of Erwin. Under the

rule above stated this evidence was not admissible to
prove such agency, but there was no objection on that
ground by the defendant Erwin, and, the evidence be-
ing an admission by Pearce, was clearly admissible against
him, and the court did not err in receiving it. None of the
other declarations mentioned above contained a direct dec-
laration of agency, and they are therefore not objectionable
on that ground.

The testimony of Hunsaker, of what Erwin told him,
was mostly statements about Erwin himself and only in-
cidentally about the Chief of Police. They are clearly ad-
missions by Erwin and as such were admissible
against him. The court expressly instructed the jury
that this testimony could not be used against any of
the other defendants; and so it was not received as against
Finch, but only as against Erwin.

We have already discussed the evidence which tends to
prove the conspiracy and the evidence which tends to con-
nect each of the defendants therewith, and held that on
both points it is sufficient to get to the jury. Thus
the testimony by Record, of his conversation with
Pearce, was admissible in evidence against all of the
defendants; not for the purpose of proving agency, this
was proved by other evidence, but as a circumstance prov-
ing the conspiracy. This conversation was in furtherance
of the conspiracy. It was an attempt by Pearce, in the
presence of Harmon, to induce Record, who was the chief
of the anti-vice squad, to make collections from the opera-
tors of illegal activities, thus trying to bring another mem-
ber into the conspiracy. The fact that Record refused to
join in the conspiracy does not prevent it from being in
furtherance of the conspiracy. This testimony was there-
fore clearly admissible.

The testimony by Holt, that Harmon said that Harris
had accused Pearce of being in the pay-off, was a conversa-
tion between Holt and Harmon after Harris had had his

conversation with each of the defendants. The parties to this action had been directly accused of being connected with this situation, by the City Attorney, and they knew that unless things could be quieted down they were going to be prosecuted. As soon as Harmon heard of this he immediately got in touch with Holt, who was making the collections, and told him what had happened, and directed him not to make any more collections, in order that things might quiet down. As far as the testimony in the case is concerned, this is the last act done under and in furtherance of the conspiracy. It is the natural thing to do under the existing circumstances, to avoid prosecution. This made the testimony of Holt intelligible. The acts done by the conspirators in order to escape the consequences thereof, even though they at that time know that the conspiracy cannot continue, are nevertheless acts done in furtherance of the conspiracy. The fact that this act was done after the time limit placed in the indictment does not make it inadmissible, as long as it was in furtherance of the conspiracy. It is a well-recognized rule of law that the exact date alleged is not material. The only question about its admissibility, therefore, is whether or not Harmon had been connected with the conspiracy. The evidence shows that Harmon called Holt on the telephone and told him to make the collections, and gave him the names, addresses, and the amounts he was to collect. He was also there when Holt took the money to Pearce, and there when Pearce approached Record and he took the money from Stubeck. This evidence is ample to show that Harmon was connected with the conspiracy, and therefore this testimony was admissible.

The testimony of Kempner, that Stubeck said that Harmon divided the money with Erwin and his crowd, is not so clear. In the spring of 1937 Kempner, according to his testimony, went with Stubeck into four card rooms in succession, and at the first one Stubeck told the man who was apparently in charge that he must pay the money "or else," and the man got the money. The circumstances indicated that Stubeck collected money from

the other places, although Kempner did not actually see him do it. Kempner further said that Stubeck then took the money to Harmon. While making collections, Stubeck said,

"All the card games have to pay, but some of them try to 'welch' on it. I take the money to Harmon, who divides it with Erwin and his crowd."

As stated before, there was sufficient evidence to connect Erwin and the other defendants, and also Harmon, with this conspiracy. The only evidence which tends to connect Stubeck with it is this testimony. At this time he was making collections from the card rooms, and delivered the money to Harmon. The fact that he made these collections and delivered the money to Harmon, and that Harmon accepted the money, shows that he was in with Harmon on this deal and had authority from him to make the collections, and thus sufficiently connects him with the conspiracy. The statements which Stubeck made to the operator of the card games while making the collections were clearly in furtherance of the conspiracy, but the statements made by him to Kempner, who had no connection with the conspiracy and with whom Stubeck transacted no business for the conspiracy, were not in furtherance thereof. Thus under the ordinary rules of agency they were not admissible. But some courts, including the Supreme Court of the United States, have enlarged this rule in cases of a conspiracy or where several persons are engaged in one crime or unlawful enterprise, and hold that whatever is said by one of the co-conspirators while doing acts in prosecution of the common enterprise, and explaining such acts, even though the statement itself is not in furtherance of the common enterprise, is admissible as evidence against all the parties thereto. The reason that is usually given therefor is that it is a part of the res gestae. See *State* v. *Haynes*, 1927, 120 Or. 573, 253 P. 7; *Delaney* v. *United States*, 263 U. S. 586, 44 S. Ct. 206, 68 L. Ed. 462. This last case is explained in *International Indemnity Company* v. *Lehman*, 7 Cir., 28 F.

2d 1, certiorari denied 278 U. S. 648, 49 S. Ct. 83, 73 L. Ed. 561; 22 C. J. S., Criminal Law, p. 1329, § 777; *People* v. *Woods,* 206 Mich. 11, 172 N. W. 384.

There are also other cases which hold that even though the declaration is not made while doing acts in furtherance of the conspiracy and accompanying and explaining such acts, if the statement is made concerning the subject of the conspiracy and during the time of its existence it is admissible against all the conspirators, and that in this case it is largely in the discretion of the trial court. See *Wiborg* v. *United States,* 163 U. S. 632, 16 S. Ct. 1127, 1197, 41 L. Ed. 289; *Connecticut Mutual Life Ins. Co.* v. *Hillmon,* 188 U. S. 208, 23 S. Ct. 294, 47 L. Ed. 446; *Carnahan* v. *United States,* 8 Cir., 35 F. 2d 96, 67 A. L. R. 1035. These statements of Stubeck were made while performing acts in furtherance of the conspiracy. He was collecting money from the operators of card games, and the statement was in explanation of his actions. He said:

"All the card rooms have to pay. Some of them try to 'welch.' I take the money to Harmon and he divides it with Erwin and his crowd."

All these statements except the last are explanations of what he was doing at the time he made the statements. The last statement goes beyond an explanation of his actions, and tells what Harmon does with the money, and explains the purpose of his actions. This statement, while not explaining his actions at the time, is a statement concerning the subject of the conspiracy, and under the last rule above stated is admissible, in the discretion of the trial court. In this case the court did not violate its descretion in receiving this evidence.

The defendants Pearce and Erwin contend that the court erred in excluding the evidence of a former adjudication. They offered in evidence the indictment bill of particulars, instructions to the jury, and verdict of acquittal, in Case No. 10785, entitled State of Utah v. E. B. Erwin and R. O. Pearce. They do not contend that the disposition of that case constituted a former jeopardy, but that it was an adjudication of facts which were an issue in that case, and that the same

facts are also an issue in this case, and that therefore the findings of the jury on such facts are now binding upon the state in this case.

A judgment of a court of competent jurisdiction, in criminal as well as civil cases, upon an issue of fact directly involved and actually determined, where the determination thereof appears with certainty by the decision of the court, in one suit, is conclusive as to that issue of fact in another suit between the same parties. See *State* v. *Hopkins,* 1933, 68 Mont. 504, 219 P. 1106; *Marvin* v. *Dutcher,* 26 Minn. 391, 4 N. W. 685; *Commonwealth* v. *Evans,* 101 Mass. 25; *Bell* v. *State,* 57 Md. 108; *Mitchell* v. *State,* 140 Ala. 118, 37 So. 76, 103 Am. St. Rep. 17; *State* v. *Cheeseman,* 63 Utah 138, 223 P. 762; *Oliver* v. *Superior Court,* 1928, 92 Cal. App. 94, 267 P. 764; *Woodman* v. *United States,* 5 Cir., 30 F. 2d 482; *Jay* v. *State,* 15 Ala. App. 255, 73 So. 137; *State* v. *Coblentz,* 169 Md. 159, 180 A. 266, 185 A. 350; *United States* v. *Oppenheimer,* 242 U. S. 85, 37 S. Ct. 68, 61 L. Ed. 161, 3 A. L. R. 516; *United States* v. *D. D. Adams,* 281 U. S. 202, 50 S. Ct. 269, 74 L. Ed. 807; *State* v. *Heaton,* 56 N. D. 357, 217 N. W. 531; *People* v. *Rogers,* 102 Misc. 437, 170 N. Y. S. 86; *Patterson* v. *State,* 96 Ohio St. 90, 117 N. E. 169, L. R. A. 1918A, 583; *Commonwealth* v. *Feldman,* 131 Mass. 588; *People* v. *Grzesczak,* 77 Misc. 202, 137 N. Y. S. 538, 27 N. Y. Cr. R. 520. Both the State and the defendants argue that the above rule is correct, but they differ in their application of this rule to the facts.

It is alleged in the indictment in the former case that the defendants, Erwin and Pearce, on or about June 1, 1937, received and accepted money with consideration from the proceeds of the earnings of women engaged in prostitution. The defendants urge that the question of whether or not the defendants, Erwin and Pearce, received the money which Holt testified he collected on that day was one of the issues in the former case, and that in this case the State attempted to prove the same fact and to

infer therefrom that a conspiracy existed between these defendants, but that the acquittal in the former case determined that Erwin and Pearce did not receive that money, and that that determination is binding on the State in this case, and that the court should have so instructed the jury. This argument overlooks the fact, that in the former case the court not only submitted that fact to the jury but also four other material facts which are not involved in this case, and instructed the jury that unless they were satisfied beyond any reasonable doubt of the existence of each and all of these five facts they should acquit the defendants. Thus, there may have been no reasonable doubt in the minds of the jury that these defendants received the money in question, but they may have still acquitted the defendants because they had a reasonable doubt as to one or all of the other facts submitted to them. There is no way to tell, by the verdict, whether or not the jury determined this question of fact at all, and, if they did, what their determination thereof was. The jury was also instructed that if they believed Holt was an accomplice they should acquit the defendants unless they found his testimony was corroborated. There is no showing that the corroborative testimony is the same in both cases. Again, the jury may have been satisfied of the existence of all of the facts submitted to them and still have acquitted the defendants because they believed Holt was an accomplice and they believed his testimony was uncorroborated. Thus it does not appear with certainty that this fact was determined or if it was it does not appear what determination thereof was made. Certainly there can be no res adjudicata of this question until we are certain which way the jury determined the issue in the former case.

A large majority of the cases above cited sustain this application of the law to the facts. Among these are the cases cited from California and from the Supreme Court of the United States. And in the case of *State* v. *Cheeseman,* supra, although the facts were somewhat different, this court applied the same principles above set out. In the case of *State*

v. *Hopkins,* supra, which defendants rely upon for their main support, the same rule is stated as in the other cases, but in applying it to the facts the court assumes, without definitely going into that question, that all the facts in issue in the former case were also at issue in the question they were deciding. An analysis of the facts in both cases probably would have disclosed that it could not be determined which way the court had decided the issue presented in the second case. But in most of the cases cited in the Hopkins case, where the court held that the facts in question had already been decided, it was apparent from the decision in the previous case just how the issue in question had been determined. Thus, in *Commonwealth* v. *Evans,* supra, Evans was charged with assaulting McKenzie with a knife, and tried and convicted. McKenzie later died, and Evans was then charged with manslaughter, but on the trial he attempted to prove that he used the knife in self-defense. The trial court held that the record in the former case was conclusive, that the assault was unjustified, and in this ruling was sustained on appeal. Where the defendant is convicted in a criminal case, the jury must find all material facts against the defendant. Thus the question of whether the assault was justifiable was determined against the defendant in the first case. But where the defendant is acquitted the jury need have only a reasonable doubt as to one material fact in issue, and thus such verdict does not disclose how any material fact was determined. In other cases all the material facts in issue in the first case were also in issue in the second case, and since one of them must have been decided in favor of the defendants the State is precluded in the second case on those issues. See *Oliver* v. *Superior Court,* 92 Cal. App. 94, 267 P. 764.

Defendants contend that the District Attorney was guilty of misconduct in his opening statement and in his remarks made during the trial and in his final argument to the jury. The opening statement was very lengthy and in great detail. It covers 73 pages of the transcript, and in it the Dis-

trict Attorney attempted to recite verbatim practically all of the many conversations which he intended to prove. A number of these conversations were obviously hearsay, and were not admitted in evidence. In several of these instances the court instructed the jury to disregard the District Attorney's statement of them. In other conversations the recital in the opening statement was more favorable to the State than when later testified to by the witnesses. There were many objections interposed, and the court repeatedly admonished the jury that the statements of the District Attorney should not be considered by them as evidence, and a number of times asked the District Attorney to make his statements more general and to omit hearsay evidence. For a short time after these admonitions the District Attorney followed them, but soon dropped back into his old habit.

The purpose of an opening statement is to advise the jury of the facts relied upon and of the questions and issues involved, which the jury will have to determine, and to give them a general picture of the facts and the situations, so that they will be able to understand the evidence. Counsel should outline generally what he intends to prove, and should be allowed considerable latitude. He should make a fair statement of the evidence, and the extent to which he may go is largely in the discretion of the trial court. He should not make a statement of any facts which he cannot legally prove upon the trial; nor should he argue the merits of his case, or relate the testimony at length. See 64 C. J. 235, Sec. 251; *State* v. *Distefano,* 70 Utah 586, 262 P. 113; *People* v. *Reed,* 333 Ill. 397, 164 N. E. 847; *Green* v. *State,* 172 Ga. 635, 158 S. E. 285. The District Attorney went way beyond what was proper, in reciting verbatim the conversations which he intended to prove, and in giving the details of his evidence. The opening statement should be a brief outline of the evidence, and not a recital at length of what he intends to prove. It was clearly misconduct on his part, to recite conversations which

were hearsay and incompetent as evidence. And it was improper for him to overstate the conversations which were admissible in evidence.

But in view of the fact that the court instructed the jury that they should not consider the opening statement as evidence, so positively and repeatedly that there could not be any mistake on the part of the jury on that question, and the fact that he instructed them to disregard the parts which were obviously incompetent, this, together with the further fact that most of the incompetent statements recited were not important in the chain of evidence, but were merely connecting statements, showing how certain evidence was obtained, this conduct, while improper, was not prejudicial to the defendants.

In order to clearly understand the remarks of the District Attorney during the trial, of which the defendants complain, it is necessary to make a brief statement of the surrounding conditions under which they were made. This was a very much contested case. The defendants insisted all during the trial, and now insist in this court, that none of the evidence introduced had any tendency to prove the allegations of the indictment, and objected continuously to the evidence which was received. There were four defendants being tried together. Each defendant had his own separate attorney, and some of them more than one. Many times all four sets of lawyers engaged in the argument on a single point and at times, after extensive arguments by the defendants had been overruled, as the witness began to answer the same question the defendants made practically the same objection again, and it was not unusual during the trial of this case that even after the court had ruled on a question both sides continued to argue. Many of the remarks which are complained of would have been better not said, but, considering the circumstances, these statements were not misconduct. In fact, most of the statements complained of were merely repartee and more or less friendly jibes between the attorneys.

Nor do we find any misconduct on the part of the District Attorney in his closing argument. In the matters complained of there was a dispute between the attorneys as to just what the evidence was. It is true that in some instances the District Attorney insisted that ■ the evidence proved more than it actually does prove. However, this was an argument of the case to the jury, and the District Attorney had a right to argue the case as he remembered it. It is not surprising that he overstated his evidence at times during this argument. The statements complained of were objected to by the defendants at the time they were made, one of the defendant's attorneys expressly calling attention to the testimony of the witnesses. The jury had heard this testimony. It had been commented on by both attorneys at the time it was given. And the jury would not thereby be misled by the statement of the District Attorney.

Defendants contend that the court erred in not giving certain proposed instructions on the question of the alleged admissions of the defendants by conduct. The proposed instructions on this question were Pearce's proposed instructions 6, 8 and 11. In Pearce's proposed instruction No. 6 it is stated, in substance, that there was nothing said and done by Pearce in his conversation with Fisher Harris which could be considered by the jury as an admission of guilt. We have already discussed the admissibility of that conversation, and determined that it was admissible. If our determination of that question is correct, then this instruction clearly was not a correct statement of the law. Pearce's proposed instruction No. 8 was also not a correct statement of the law. It stated that there can be no admission by silence unless there is a direct accusation of the charge involved in the case, made against the defendant. This is clearly not the law, as is shown by the discussion on the admissibility of that evidence.

Defendant Pearce contends that the court erred in refusing to give his proposed instruction No. 11. This instruc-

tion, in substance, states that any statement made by Harris or other witnesses to the defendant Pearce ▮▮ or to other defendants, as to what such witness had heard or found out, as to any facts or conditions in Salt Lake City, was not evidence of the truth of the assertions made in such statement. The State argues that

"this statement is too broad, in that it excludes statements acquiesced in by the defendants and certainly such statements are admissible in evidence."

The question of whether these statements are admissible in evidence has no bearing upon the correctness of this instruction. This instruction does not deal with the admissibility of evidence. It merely states the effect to be given to such evidence. However, it is evident that the State intended to argue that if the defendant Pearce by his actions, etc., admitted the truthfulness of these accusations, that fact would be proof that the assertions were true. A careful reading of this proposed instruction shows that it does not tell the jury that the admission of the truthfulness of these statements by Pearce did not prove them to be true, but merely tells the jury that the assertion by the witness of facts in his conversation with Pearce did not prove those facts to be true. This proposed instruction was a correct statement of the law, and should have been given, and the court's refusal to do so was error. However, the evidence as to the existence of the facts stated in that conversation between Harris and Pearce and in the other statements referred to is ample to prove that those assertions were true. In fact, there is no evidence to the contrary. In view of that fact, the refusal of the court to give this instruction, while erroneous, was not prejudicial to the defendants.

The only instruction given by the court on the question of admissions by silence and actions tending to show guilty consciousness of the defendants when confronted by accusations was a short definition of the term "admission." The State depended very largely on this type of evidence. ▮ It would have been highly desirable for the

court to have instructed the jury fully on the purpose of this type of evidence and explained to them the theory upon which it is admissible, and the inferences which might be drawn therefrom and stated the limits to which it could be used. Defendants proposed a number of instructions on this subject, but except as herein stated, these proposed instructions were not correct statements of the law. In view of this fact, the court did not err in not instructing on this matter.

There was also no error committed by the court in refusing to give defendant Erwin's proposed Instructions Nos. 19 and 22. Erwin's proposed instruction No. 19 stated that the jury must not consider any statement alleged to have been made by Erwin to Ben Hunsaker as being an admission, and his proposed instruction No. 22 says about the same thing with reference to Erwin's conversation with Fisher Harris. This question is gone into extensively in discussing the admissibility of this evidence, and from that discussion it is apparent that these instructions are not correct statements of the law.

Defendants further complain that the instructions given by the court tend to indicate to the jury that it might find the defendants guilty without actual proof of their entering into the alleged agreement. They cite instructions 7, 12 and 12-A, as showing this was done. Instruction 7 tells the jury, in substance, that they can convict on circumstantial evidence if they considered it sufficiently strong, and states in detail how strong it must be. Instruction 12 tells the jury, in substance, that if they find that Erwin, Finch and Thacker failed to do their duty as city officials in enforcing the laws against prostitution and gambling they might take that fact into consideration in determining whether or not there was such an agreement as was alleged in the indictment. Instruction 12-A tells the jury that in order to find any of the defendants guilty they must find beyond a reasonable doubt that such defendant

was a party to the *"conspiracy or agreement or actually participated therein, in carrying out the same."*

Instructions 7 and 12 were correct statements of the law. But counsel says that the last part of instruction 12-A "permitted the conviction for any act in any way connected with any of the operations mentioned in the indictment; that in any view they would have to participate in acts to carry out the conspiracy knowing of the existence of the conspiracy." It is true that before a defendant could be lawfully convicted of this offense he must participate in the conspiracy with knowledge of its existence, and that if he did an act in carrying out the conspiracy, but did not know that a conspiracy existed, then his conviction would be erroneous. The court, however, clearly and positively instructed the jury to that effect, in instructions 5-b, 5-c, and also 19. In this connection, in all of these instructions the court told the jury that unless they found the facts enumerated they could not convict. It did not say that if they found the facts enumerated they should convict. If the court had told the jury that if they found the defendants actually participated in the conspiracy in carrying out the same, they must convict, then it would be in direct conflict with the other instructions, but as it is now there is no conflict. The court merely failed to enumerate all the necessary elements to be found in order to convict. The failure to enumerate all these necessary elements in each instruction was not error.

The defendants further complain, of instruction 16. They say that when the court said, "you must find from the facts in evidence, from which it may be reasonably inferred that the offense was committed in Salt Lake County," the court does not make a correct statement of the law, but that the court should have said, "that the circumstances relied upon by the prosecution must so distinctly indicate the guilt of the accused as to leave no reasonable explanation of them which is consistent with the prisoner's innocence." *Terry* v. *United States*, 9 Cir., 7 F. 2d 28. The part quoted is merely the heading of the instruction, and

there is no dispute whatever that the offense was committed in Salt Lake County if any was committed. But, defendants say that, this being the heading of this statement, it applies to all of the elements of the offense that are thereafter named. The part above quoted from the instruction is referring to circumstantial evidence and the inference which might be drawn therefrom. It does not attempt to define the limitations of such inferences nor to state how strong the circumstantial evidence must be in order to justify conviction. This was, however, fully done in instruction No. 7, where the court in great detail tells the jury that in order to make an inference of guilt from circumstantial evidence the circumstances must be so strong that they exclude every reasonable hypothesis of innocence. Thus the jury, in reading the instruction complained of, would be required to take into consideration the explanation on circumstantial evidence which was given in instruction 7, the same as where the court defines a word; it would not be necessary to repeat the definition every time the word was used.

Defendants also complain that in paragraph 5 of instruction 16, in enumerating the overt acts the court does not say that the overt acts enumerated must have been committed by one of the defendants or a party to the agreement. However, the court did expressly tell the jury in other instructions that the overt acts must be done by one of the parties to the agreement, and here again, as in the previous paragraph, it was not necessary for the court to repeat this limitation in this instruction, and the court committed no error in that regard.

There are many other points argued or suggested in counsel's brief, which are not directly pointed out and considered here, but all of the brief has been carefully read and considered, and most of these points are cleared up indirectly in other discussions. The questions which have not been directly discussed here we consider unimportant, and therefore have not mentioned them.

The judgment is affirmed.

MOFFAT, C. J., and LARSON and PRATT, JJ., concur.

McDONOUGH, J., being disqualified, did not participate herein.

WOLFE, Justice (concurring).

I concur. Without any intention of detracting from the painstaking care and conscientious labor which the opinion itself shows the author thereof has put into it, I feel impelled nevertheless to make some reservations and qualifications thereto.

Appellants argue that the indictment is insufficient in that it does not charge that there was an agreement between appellants and the operators of the places being conducted in violation of the law. The opinion sufficiently answers this contention by stating that it was unnecessary to charge such an agreement. But it goes on to state that that part of the charge which specifies that the defendants agreed among themselves and with "divers other persons to the grand jury unknown" indirectly charges an agreement between the city officials and said operators. Since the indictment naming specific individuals is good even though it may appear from the evidence that others not named also participated in the conspiracy in one form or another, I do not think we need hold that the operators were by implication included by the phrase "divers other persons."

It may well be that at some point in the trial the prosecutor may have to declare whether he is urging that certain persons unnamed as defendants are or are not parties to the conspiracy under the "catch all" phrase. He could hardly contend at one time that they were conspirators for the purpose of making their declarations evidence against other alleged parties to the conspiracy and at another time that they were not so in order to use them as witnesses not subject to the accomplice rule. And the court may be re-

quired to decide whether they have been proved prima facie conspirators. But certainly in testing the sufficiency of the indictment it is not necessary that after-revealed persons as conspirators should have been joined as defendants.

In considering the question of proof of the corpus delicti the opinion states that the agreement must be proved "without the aid of the admissions of the defendants themselves." However, I am of the opinion that admissions not amounting to a confession of the crime or at least of an essential element thereof may be used in establishing the corpus delicti. And certainly in this case such admissions were necessary to establish the conspiracy.

On this matter of proof of corpus delicti and corroboration of an accomplice's testimony the opinion sets out somewhat at length what the law is and how it applies to the present case. I think it recognizes that the principles of law regarding proof of corpus delicti and corroboration of an accomplice's testimony are entirely separate and distinct and should not be confused when determining whether the requirements of proof of corpus delicti have been met. There is nothing which prevents an accomplice's testimony from establishing the commission of a crime. And if the crime encompasses an agreement, certainly the agreement may be proved by the evidence of an accomplice who was or claims to have been a party to the agreement. That would be evidence of a verbal act. But the rule as to corroboration of an accomplice's testimony would prevent conviction without the corroboration required by the statute.

The restriction is that a defendant shall not be convicted by the testimony of the accomplice alone, but there must be corroborating evidence *connecting* such defendant with the offense. While extrajudicial confessions of an accused cannot be used to establish the corpus delicti as to him, there is no prohibition of using the testimony of an accomplice to show the commission of the crime. See Wigmore on Evidence and cases cited in main opinion. Having these principles in mind, it is not difficult to establish the existence

of the conspiracy in the present instance and the connection of each defendant therewith.

While I concur in the holding that defendant Pearce's requested instruction 5 was properly refused, I am not prepared to concur in the statement contained in the prevailing opinion to the effect that even if the evidence

"is susceptible to the interpretation that there were more than one unconnected conspiracy, each of them was of the same kind as alleged in the indictment, and therefore the defendants, were convicted of the same kind of a conspiracy which took place within the same time and place alleged, and there was no prejudicial error in refusing to so instruct the jury."

Briefly, I cannot see how under the evidence of this case separate conspiracies—each supported by its overt act chargeable to its corresponding conspiracy or by overt acts common to all the supposed separate conspiracies—can be spelled out. The transactions involved here are so closely interwoven that any attempt to instruct the jury on the theory that they might be segregated into separate conspiracies would have revealed the impossibility of drawing any sort of line and would only have resulted in confusion. I think the State's case must stand or fall on the theory of one general conspiracy, but I think the evidence amply supports the existence of a general conspiracy.

As to the testimony of Kempner who stated that Stubeck told him that the money which Stubeck paid to Harmon was divided with Erwin and his crowd, the court's opinion discusses res gestae and declarations made in furtherance of the conspiracy and concludes that such statements were admissible. However, I have grave doubt as to whether the testimony of what Harmon did with the money was admissible under either the theory of declarations or res gestae. While the trial court may have discretion to admit testimony as to declarations made in furtherance of the conspiracy, such declarations would have to be made by one whom the independent evidence established as a conspirator. But I am not prepared to go to the extent of laying down a rule

that a declaration not made in furtherance of the conspiracy or not accompanying and explaining acts done in furtherance of the conspiracy is admissible at the discretion of the court if it pertains to the conspiracy and is made during the period of the existence of the conspiracy. The United States Supreme Court cases do not go that far. They are really res gestae cases. The declarations considered in those cases, while not themselves in furtherance of the conspiracy, were contemporaneous with an act in furtherance thereof and served to explain or give color, meaning or complexion to that act. This feature that the circumstances or statements accompanying or surrounding an act must serve to explain, or give it meaning are ofttimes forgotten even by courts in the test of what is admissible as res gestae. See concurring opinion in *State* v. *Rasmussen,* 92 Utah 357, 68 P. 2d 176.

A statement which meets all the requirements of spontaneity so as to be the automatic utterance of the person who makes it has no purpose to serve and cannot be excepted from the hearsay rule if it is simply accumulative of other testimony and does not explain or give meaning to the act with which it is contemporaneous. The statement of Stubeck that he gave the money to Harmon gave meaning to the whole act of collection and explained its nature. It was not an act of Stubeck's initiative but an act part of a more comprehensive situation. But I doubt whether the statement as to what Harmon did with the money in any way explained or colored or gave meaning to Stubeck's acts of collection. Hence it must, if properly admissible, come under the rule which permits declarations, independently of whether they meet the test of res gestae. Declarations are bottomed on the principal and agent relationship. If in a conspiracy one party is acting for the others—that is in pursuance of their common business—and that party independently of his declarations has been prima facie proved a partner in the said business (conspiracy), his declarations are admissible *against the others*. Of course if they contain the ele-

ment of an admission as distinguished from what is known in the law of evidence as a declaration they are admissible as against the utterer regardless of whether they may be admissible as against others.

I am not prepared to agree that statements not in furtherance of the conspiracy nor contemporaneous with an act thereof and not serving to explain the contemporaneous act which they accompany may be admitted even at the discretion of the trial court simply because the utterer has been prima facie proved to be a conspirator and they are made during the period the conspiracy endured. Such would make the narrations of a loose-tongued prima facie confederate at some social gathering admissible as against his alleged conspirators. This seems to me a departure from the rule on which declarations in a conspiracy are based, to wit: mutuality in the enterprise.

While the tendency of the law is directed toward an enlarging of the number of exceptions to the hearsay rule (See Chapter VII of the Tentative Draft No. 2, Code of Evidence of the American Law Institute, submitted March 1941), it is doubtful whether, were that proposed Code the law of this state, Kempner's testimony of what Stubeck said Harmon did with the money would be admissible.

Under Rule 601 of the Tentative Draft such utterance would be a hearsay statement and therefore admissible only if it met the tests of Rules 606 or 607. Apparently it meets the tests of neither of these rules. The tests laid down in Rule 608 of the Tentative Draft are inapplicable because the utterance of Stubeck of what Harmon did with the money is not a hearsay declaration under Rule 601.

But I have not voted for a reversal even if the statement made by Stubeck of what Harmon did with the money was erroneously admitted. While I do not think the matter so inconsequential as not to have had its effect on the jury, I think considered in the light of the whole record it was not prejudicial error. Section 105-43-1, R. S. U. 1933, reads:

"After hearing an appeal the court must give judgment without regard to errors or defects which do not affect the substantial rights of the parties. If error has been committed, it shall not be presumed to have resulted in prejudice. The court must be satisfied that it has that effect before it is warranted in reversing the judgment."

It is the duty of this court not only to determine whether error was committed but whether in view of the whole record the error could be said to have been prejudicial. Erroneously admitted evidence, if taken by itself or treated as if it were the only evidence before the jury, might be highly prejudicial but if taken in the light of other evidence, its significance to affect the final result might be comparatively slight. If we can say that the evidence, absent the erroneously admitted testimony, is such as to make it highly improbable that the jury would have come to a different conclusion we must affirm. One of the duties enjoined upon us is to measure the influence of the erroneously admitted testimony as compared to the whole testimony and if we can say that absent the former testimony the other evidence is so clear and convincing that the jury must have nevertheless come to the same conclusion we should not on account of the erroneous testimony reverse. I am satisfied even though the evidence of Stubeck's remark that Harmon divided with Erwin and his crowd had been omitted the result would not have been different. I therefore concur.